Opinion
DUARTE, J.
These two consolidated cases involve the California Global Warming Solutions Act of 2006 (the Act) (Health & Saf. Code, § 38500 et seq.; see Stats. 2006, ch. 488; § 1, p. 3419, enacting Assem. Bill No. 32 (2005-2006 Reg. Sess.), popularly known as “AB 32”).[1] The Act was passed by a simple majority vote of both legislative houses. Its general purpose is to reduce greenhouse gas (GHG) emissions to protect the environment.
Plaintiffs and allied amici curiae do not quarrel with the Act or its goals, but attack one part of the implementing regulations adopted by the State Air Resources Board (Board). (§ 39003.) The Board created a ‘“cap-and-trade” program that includes the auction sale of some—hut not all—GHG emissions allowances. Covered entities—generally large emitters of GHGs—must either surrender sufficient compliance instruments (emissions allowances or offset credits) to cover the amount of pollutants they discharge, or face monetary penalties or other negative consequences. (See § 38580; Cal. Code Regs., tit. 17, §§ 96012-96014.) The Board distributes some emissions allowances for free, but sells others at quarterly auctions. A covered entity that cannot reduce its emissions below the amount authorized by its free allowances and any offset credits it has obtained must purchase more allowances at the Board’s quarterly auctions, or on a secondary market where allowances are sold or traded without Board control.
As in the trial court, on appeal plaintiffs assert (1) the auction sales exceed the Legislature’s delegation of authority to the Board to design a market-based emissions reduction system, and (2) the revenue generated by the auction sales amounts to a tax that violates the two-thirds supermajority vote requirement of Proposition 13. (Cal. Const., art. XIII A, § 3.) The trial court rejected these two claims in a thorough written decision.
*614 As for the first question, we hold that the Legislature gave broad discretion to the Board to design a distribution system, and a system including the auction of some allowances did not exceed the scope of legislative delegation. Further, the Legislature later ratified the auction system by specifying how to use the proceeds derived therefrom.
As for the second question, although our reasoning differs from that of the trial court, we agree that the auction sales do not equate to a tax. As we shall explain, the hallmarks of a tax are: (1) that it is compulsory and (2) that the payor receives nothing of particular value for payment of the tax, that is, the payor receives nothing of specific value for the tax itself. Contrary to plaintiffs’ view, the purchase of allowances is a voluntary decision driven by business judgments as to whether it is more beneficial to the company to make the purchase than to reduce emissions. Reducing emissions reduces air pollution, and no entity has a vested right to pollute. Further, once purchased, either from the Board or the secondary market, the allowances are valuable, tradable commodities, conferring on the holder the privilege to pollute. Indeed, speculators have bought allowances seeking to profit from their sale, and as one party puts it, taxes do not attract volunteers. These twin aspects of the auction system, voluntary participation and purchase of a specific thing of value, preclude a finding that the auction system has the hallmarks of a tax.
The bulk of the briefing in the trial court and on appeal discusses the test to determine whether a purported regulatory fee is instead a tax subject to Proposition 13. The key authority is Sinclair Paint Co. v. State Bd. of Equalization (1997) 15 Cal.4th 866 [64 Cal.Rptr.2d 447, 937 P.2d 1350] (Sinclair Paint) and its progeny. However, as we explain in more detail, post, the Sinclair Paint test is not applicable herein, because the auction system is unlike other governmental charges that may raise the “tax or fee” question resolved thereby. The system is the voluntary purchase of a valuable commodity and not a tax under any test.
Accordingly, we shall affirm the judgments denying the petitions in these consolidated cases.
BACKGROUND
In 2006 the Legislature passed and Governor Schwarzenegger signed the Act, which requires that covered entities reduce GHG emissions to 1990 levels by the year 2020. The Act did not pass by a two-thirds vote of each legislative house.
A decision by another appellate court summarized the Act as follows:
*615 “The [Act] is supported by legislative findings that global warming poses a ‘serious threat’ to the ‘economic well-being, public health, natural resources, and the environment of California,’ and that global warming will have ‘detrimental effects on some of California’s largest industries.’ (§ 38501, subds. (a), (b).) . . .
“The [Act] designates the Board as ‘the state agency charged with monitoring and regulating sources of emissions of greenhouse gases that cause global warming in order to reduce emissions ....’(§ 38510.) In making this designation, the Legislature codified its intention that the Board ‘design emissions reduction measures to meet the statewide emissions limits for greenhouse gases ... in a manner that minimizes costs and maximizes benefits for California’s economy, improves and modernizes California’s energy infrastructure and maintains electric system reliability, maximizes additional environmental and economic co-benefits for California, and complements the state’s efforts to improve air quality.’ (§ 38501, subd. (h).)
“The [Act] subjects the Board to several directives. Among other things, the Board is required to (1) adopt regulations for statewide reporting and monitoring of GHG emissions (§ 38530); (2) establish a statewide GHG emissions limit to be achieved by 2020 that is equivalent to the 1990 state GHG emissions level (§ 38550); (3) adopt rules and regulations to ‘achieve the maximum technologically feasible and cost-effective greenhouse gas emission reductions . . . subject to the criteria and schedules’ set forth in the act (§ 38560); and (4) adopt and implement a list of discrete early action GHG emission reduction measures (§ 38560.5).” (Our Children’s Earth Foundation v. State Air Resources Bd. (2015) 234 Cal.App.4th 870, 874 [184 Cal.Rptr.3d 365] (Our Children ’s Earth).)
The Board promulgated regulations that created a cap-and-trade system which included an auction component. (Cal. Code Regs., tit. 17, § 95801 et seq.; see Association of Irritated Residents v. State Air Resources Bd. (2012) 206 Cal.App.4th 1487, 1498, fn. 6 [143 Cal.Rptr.3d 65] (Residents) [describing how a cap-and-trade system works generally].) Its purpose “is to reduce emissions of [GHG] associated with entities identified in this article through the establishment, administration, and enforcement of the California Greenhouse Gas Cap-and-Trade Program by applying an aggregate [GHG] allowance budget on covered entities and providing a trading mechanism for compliance instruments.” (Cal. Code Regs., tit. 17, § 95801.) Covered entities must reduce their emissions below a threshold point, or obtain offset credits or emissions allowances, either from the Board or the open market. The Board distributes some allowances for free, retains some in a price containment reserve to buffer against unexpectedly high auction prices, and auctions the rest periodically. After each compliance period, an entity must surrender *616 unused allowances. But as the trial court found, allowances are tradable, which “creates a market for carbon allowances.”[2] Covered entities include manufacturing, production, and utility operations that emit threshold amounts of GHGs. (See Cal. Code Regs., tit. 17, §§ 95811-95812.)
The regulatory system has been summarized briefly as follows:
“[Effective] January 2012, the Board implemented the ‘California Cap on Greenhouse Gas Emissions and Market-Based Compliance Mechanisms’ pursuant to its authority under the 2006 Act. (See Cal. Code Regs., tit. 17, §§ 95801-96022 . . . .) The purpose of this ‘Cap-and-Trade’ program regulation is ‘to reduce emissions of greenhouse gases’ from sources covered by the program ‘by applying an aggregate greenhouse gas allowance budget on covered entities and providing a trading mechanism for compliance instruments.’ ([Cal. Code Regs., tit. 17], § 95801.) Entities covered ... are from a broad spectrum of industries, including electricity, natural gas and fuel suppliers, each of whom has previously reported GHG emissions that exceed a threshold established by the Board ....
“The program imposes a ‘cap’ on the aggregate GHG emissions these covered entities may emit during the annual compliance period. ([Cal. Code Regs., tit. 17], §§ 95801, 95802, subd. (a)(53).) The Board enforces the cap, which is lowered over time, by issuing a limited number of . . . ‘allowances,’ the total value of which is equal to the amount of the cap. (Id., § 95820.) Each allowance represents a limited authorization to emit up to one metric ton of carbon dioxide equivalent of greenhouse gases (C02e), subject to stated restrictions. (Ibid.) Covered entities demonstrate compliance with the program by the timely surrender of allowances which correspond to that entity’s compliance obligation during the relevant compliance period which is calculated pursuant to a formula set forth in the program regulation. (Id., §§ 95854-95856.) Subject to restrictions and limitations, allowances are tradable, which means that individual participants can buy, bank or sell allowances which are used by the covered entities to satisfy their compliance obligations. (Id., §§ 95920-95923, 95856.)
“A covered entity can also use offsets to meet a percentage of its compliance obligation under the program. [Citations.] An offset is a voluntary . . . reduction from a source that is not directly covered by the Cap-and-Trade program which is used by a covered entity to comply with the program’s GHG emissions cap.” (Our Children’s Earth, supra, 234 Cal.App.4th at pp. 876-877, fns. omitted.)
*617 “In crafting these regulations, the Board was required to follow nine statutory guidelines, ‘to the extent feasible and in furtherance of achieving the statewide greenhouse gas emissions limit ....’(§ 38562, subd. (b).) These guidelines directed the Board to attempt to minimize costs, maximize the total benefits to California, encourage early action to reduce GHG emissions, avoid disproportionate impact on low-income communities, award appropriate credit for early voluntary reductions, complement existing federal and state standards, consider cost-effectiveness, consider overall societal benefits, minimize administrative burdens of implementation and compliance, minimize leakage {id., subd. (b)(1)—(8)), and ‘[c]onsider the significance of the contribution of each source or category of sources to statewide emissions of greenhouse gases’ {id., subd. (b)(9)).
“The Legislature expressly authorized the Board to adopt regulations which establish market-based compliance mechanisms ‘in furtherance of achieving the statewide [GHG] emissions limit.’ (§ 38562, subd. (b); see § 38570, subd. (a) . . . .) The act defines a market-based compliance mechanism as ‘either of the following: [¶] (1) A system of market-based declining annual aggregate emissions limitations for sources or categories of sources that emit greenhouse gases. [¶] (2) Greenhouse gas emissions exchanges, banking, credits, and other transactions, governed by rules and protocols established by the state board, that result in the same greenhouse gas emission reduction, over the same time period, as direct compliance with a greenhouse gas emission limit or emission reduction measure adopted by the state board pursuant to this division.’ (§ 38505, subd. (k).)” {Our Children’s Earth, supra, 234 Cal.App.4th at p. 875.)
Over time, the number of allowances (the “cap”) will decrease—to reduce the total GHG emissions—which in theory should increase the value of remaining allowances. The auctions are expected to generate a great deal of money over the life of the program. By 2020, the Board plans to auction about half of the total allowances. The Board, citing materials in its unopposed request for judicial notice, asserts (without dispute by any party) that as of January 1, 2015, about 500 million allowances have been distributed for free, about 75 million have been auctioned, and that the price containment reserve has not been tapped.[3]
At auction, there is a single round of sealed bidding, and winning bidders pay the “settlement” or “clearing” price, that is, the lowest price that will *618 clear all allowances in that tranche. (See Cal. Code Regs., tit. 17, § 95911, subds. (a), (e).) Thus, some bidders will pay less than they were willing to pay. First by regulation and now by statute, the proceeds are kept in a fund to further the Act’s purposes.[4] (Cal. Code Regs., tit. 17, § 95870, subd. (b)(3); see Gov. Code, § 16428.8.)
In 2012 the Legislature passed four bills specifying how auction proceeds would be used to effectuate the Act, and diverting $500 million to the General Fund for related purposes. None passed by a two-thirds vote of each house.[5]
The first suit was then filed by the California Chamber of Commerce and taxpayer Larry Dicke (jointly, CalChamber) against the Board, its members, and its executive officer, seeking to invalidate the auctions. The Environmental Defense Fund and Natural Resources Defense Council (jointly, EDF) intervened on behalf of the Board, and NAM intervened against the Board. In a second suit, Morning Star Packing Company (Morning Star) and other entities sued the same defendants, attacking the same regulations on essentially the same grounds.[6]
The trial court deemed the two cases to be related, heard a joint oral argument, and issued a joint written decision rejecting the petitions.
Plaintiffs timely appealed in each case, and we accepted a stipulation by the parties to consolidate the appeals.[7]
*619 DISCUSSION
I

Legislative Delegation

The first question resolved by the trial court was whether the Legislature vested the Board with discretion to create a distribution system that included an auction. We agree with the trial court that the Legislature conferred on the Board extremely broad discretion to craft a distribution system, and the fact the Legislature did not explicitly refer to an auction of allowances does not mean such an auction falls outside the scope of the delegation. Moreover, by later specifying how the proceeds of the auctions would be used, the Legislature effectively ratified the auction system created by the Board.
A. Standard of Review
We have set out the general standard for determining the validity of administrative regulations in a prior case as follows:
“ ‘Government Code section 11342.2 provides the general standard of review for determining the validity of administrative regulations. That section states that “[wjhenever by the express or implied terms of any statute a state agency has authority to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, no regulation adopted is valid or effective unless [1] consistent and not in conflict with the statute and [2] reasonably necessary to effectuate the purpose of the statute.”
“ ‘Under the first prong of this standard, the judiciary independently reviews the administrative regulation for consistency with controlling law. . . . In short, the question is whether the regulation is within the scope of the authority conferred; if it is not, it is void. This is a question particularly suited for the judiciary as the final arbiter of the law, and does not invade the technical expertise of the agency.
“ ‘By contrast, the second prong of this standard, reasonable necessity, generally does implicate the agency’s expertise; therefore, it receives a much more deferential standard of review. The question is whether the agency’s action was arbitrary, capricious, or without reasonable or rational basis.’ ”
*620 (Morning Star Co. v. Board of Equalization (2011) 201 Cal.App.4th 737, 744-745 [135 Cal.Rptr.3d 457] (Morning Star).)
In reviewing the regulations in this case, “We keep in mind that ‘the burden is on the party challenging a regulation to show its invalidity.’ ” (California School Bds. Assn. v. State Bd. of Education (2010) 191 Cal.App.4th 530, 544 [119 Cal.Rptr.3d 596] (California School Bds.); see Association of California Ins. Companies v. Jones (2017) 2 Cal.5th 376, 389 [212 Cal.Rptr.3d 395, 386 P.3d 1188] (Jones).)
B. The Act Is Broad Enough to Encompass an Emissions Allowance Auction
The Board contends authorization to “[d]esign the regulations, including distribution of emissions allowances where appropriate,” as well as authority to “adopt ... a system of market-based declining annual aggregate emission limits,” subject to specified criteria, vested it with authority to sell some allowances at auction. (§ 38562, subds. (b)(1), (c); see § 7.) For the Board to prevail, we need only find that the auction regulations are “ ‘consistent and not in conflict with’ ” the organic statute (Morning Star, supra, 201 Cal.App.4th at p. 747); they are.
Plaintiffs emphasize that any implied administrative powers must be “ ‘essential to the declared objects and purposes of the enabling act—not simply convenient, but indispensable. Any reasonable doubt concerning the existence of the power is to be resolved against the agency.’ ” (Addison v. Department of Motor Vehicles (1977) 69 Cal.App.3d 486, 498 [138 Cal.Rptr. 185], quoting former 2 Cal.Jur.3d, Administrative Law, § 39, pp. 257-258, now 2 Cal.Jur.3d (2015) Administrative Law, § 175, pp. 222-223.) But here, there is an explicit delegation to the Board to design a method to distribute allowances. When an agency exercises discretion explicitly conferred on it, it is presumed to act within legislative intent. An “agency is not limited to the exact provisions of a statute in adopting regulations to enforce its mandate. ‘[The] absence of any specific [statutory] provisions regarding the regulation of [an issue] does not mean that such a regulation exceeds statutory authority ... .’ [Citations.] [An agency] is authorized to ‘ “fill up the details” ’ of the statutory scheme.” (Ford Dealers Assn. v. Department of Motor Vehicles (1982) 32 Cal.3d 347, 362 [185 Cal.Rptr. 453, 650 P.2d 328]; see California School Bds., supra, 191 Cal.App.4th at p. 544.)
NFIB contends an auction is not “reasonably necessary” to the Act’s purposes and, somewhat similarly, CMTA argues the Board did not properly balance the relevant statutory factors. The Board aptly replies that such “argument conflates two distinct parts of the analysis of quasi-legislative *621 rulemaking: the question of ‘authority’—which the court reviews independently, giving weight to the agency’s construction—and the question of ‘reasonable necessity’—which the court reviews with great deference to the agency.” (See also Jones, supra, 2 Cal.5th at pp. 396-397.) It was rational for the Board to include an auction component in the regulations, given the broad statutory delegation. We may not ‘“superimpose [our] own policy judgment upon the agency in the absence of an arbitrary and capricious decision.” (Pitts v. Perluss (1962) 58 Cal.2d 824, 832 [27 Cal.Rptr. 19, 377 P.2d 83]; see Western States Petroleum Assn. v. State Dept. of Health Services (2002) 99 Cal.App.4th 999, 1007 [122 Cal.Rptr.2d 117] [‘‘the existence and weight to be accorded the facts and policy considerations that support the regulation” fall within agency’s bailiwick]; see also Jones, at p. 390.)[8]
Plaintiffs launch a number of challenges to the conclusion that the legislature gave the Board sufficient discretion to adopt an auction component if it adopted a cap-and-trade program. The trial court summarized plaintiffs’ arguments as follows: “Petitioners do not dispute that the cap-and-trade program requires emission allowances to be distributed in some manner. However, Petitioners argue that the text, structure, and legislative history of AB 32 show that the Legislature did not intend to authorize the sale of allowances. According to Petitioners, [the Board’s] discretion is limited to choosing a method for distributing the allowances free of charge (or at least in a ‘revenue-neutral’ manner). Petitioners raise the following arguments in support of their position: (1) the statute does not explicitly authorize [the Board] to auction allowances; (2) the legislative history includes no discussion of the term ‘auction;’ (3) at the time of AB 32’s enactment, most cap-and-trade program allowances were distributed for free; (4) construing AB 32 as authorizing the sale of allowances renders the administrative fee provision of the Act ([§] 38597) surplusage; (5) the chief sponsor of AB 32 (ostensibly) assured his colleagues on the floor of the Legislature, just before the vote, that the only funds to be generated under AB 32 were those generated by the administrative fee provision; (6) there is no guidance in AB 32 as to how to spend any auction revenues; and (7) the Legislature failed to enact a bill in 2009 that would have expressly authorized [the Board] to auction the allowances.”
Because the briefing on appeal largely replicates these seven points, for convenience we will discuss them in the order assigned by the trial court. We then address an eighth point briefed on appeal, regarding the doctrine of constitutional doubt.
*622 1. No Explicit Authorization
Contrary to the view posited by plaintiffs, there was no requirement that the Legislature explicitly authorize or even discuss emissions auctions in the Act in order for the Board to adopt regulations calling for such auctions.
The Act is a mere 12 pages long (see Stats. 2006, ch. 488, § 1, pp. 3419-3431), and it broadly sets forth its goals. The Legislature obviously intended the program to be a creature of the Board, either in deference to the Board’s expertise, or out of pragmatic necessity to secure passage, or for both reasons. From the generality of the Act, it is clear that the Board “ ‘has been granted considerable discretion to determine what is necessary to accomplish’ ” (Residents, supra, 206 Cal.App.4th at p. 1495; see Jones, supra, 2 Cal.5th at pp. 390-391) the Legislature’s goals. As another court observed, the breadth of legislative delegation was generous in this case: (4) “The Board is directed to ‘consult with all state agencies with jurisdiction over sources of greenhouse gases’ . . . and to receive public input . . . , to ‘consider all relevant information pertaining to greenhouse gas emissions reduction programs’ in other jurisdictions . . . , to ‘evaluate the total potential costs and total potential economic and noneconomic benefits of the plan . . . to California’s economy, environment, and public health, using the best available economic models, emission estimation techniques, and other scientific methods’ . . . and, ultimately, to ‘identify and make recommendations on direct emission reduction measures, alternative compliance mechanism[s], market-based compliance mechanisms, and potential monetary and nonmon-etary incentives for sources and categories of sources that the [Board] finds are necessary and desirable to facilitate the achievement of the maximum feasible and cost-effective reductions of greenhouse gas emissions by 2020’ .... These directives are exceptionally broad and open-ended. They leave virtually all decisions to the discretion of the Board, from determining the nature of a scoping plan, to determining the best available research techniques, to determining incentives for emissions reduction that are ‘necessary and desirable,’ to weighing economic, environmental and public health benefits, to determining what is most ‘feasible and cost-effective.’ ” (Residents, supra, 206 Cal.App.4th at p. 1495, citations omitted, second italics added; see Our Children’s Earth, supra, 234 Cal.App.4th at p. 888.)
In particular, “In adopting regulations . . . , to the extent feasible and in furtherance of achieving the statewide greenhouse gas emissions limit, the state board shall do all of the following: [¶] (1) Design the regulations, including distribution of emissions allowances where appropriate, in a manner that is equitable, seeks to minimize costs and maximize the total benefits *623 to California, and encourages early action to reduce greenhouse gas emissions.” (§ 38562, subd. (b), italics added.)[9]
The statute allowing the Board to design regulations that include ‘“distribution of emissions allowances” (§ 38562, subd. (b)) gave the Board great flexibility. Plaintiffs’ assertions that this statute does not permit an auction system are unconvincing.[10]
The petitions do not dispute that the Act permitted the Board to adopt a cap-and-trade system, as opposed to, for example, a more traditional regulatory enforcement system sometimes referred to as a “command-and-control” system. But once such a system was chosen, the Board had to decide who would capture the value of distributed allowances, the covered entities or the state. As the trial court explained, ‘“Allowances can be allocated free of charge, sold by the regulating authority through an auction or direct sale, or allocated by some combination of these methods. If covered entities receive the allowances free of charge, they capture the value associated with the allowances. If allowances are sold or auctioned, the government captures the value created by the cap. Whatever the allocation, whoever receives the initial allocation of allowances will receive a ‘windfall’ equal to the value created by the constraint.”[11] (Fn. omitted.)
The Legislature presumably knew that if the Board chose a cap-and-trade system, some entity would capture the constraint value, but did not specify the recipient. As Burtraw points out, the idea of auctioning some or all cap-and-trade allowances long had been debated by scholars. (See McAllister, The Overallocation Problem in Cap-and-trade: Moving Toward Stringency *624 (2009) 34 Colum. J. Envtl. L. 395, 441-442; Stavins, A Meaningful U.S. Cap-and-trade System to Address Climate Change (2008) 32 Harv. Envtl. L.Rev. 293, 365; Ackerman & Stewart, Reforming Environmental Law (1985) 37 Stan. L.Rev. 1333, 1343.)
Further, as the trial court observed, “Petitioners admit that at least two well-known cap-and-trade programs preceding the adoption of AB 32 [the federal 1990 Clean Air Act and the European Union’s Emission Trading System] authorized allowances to be sold or auctioned. [Citation.] Similarly, the U.S. EPA’s 2003 guide [Tools of the Trade: A Guide to Designing and Operating a Cap and Trade Program for Pollution Control] states that the first major step ... is to decide whether allowances will be allocated at no cost or” auctioned. The Act requires the Board to “consider all relevant information pertaining to [GHG] emissions reduction programs in other states, localities, and nations, including the northeastern states of the United States, Canada, and the European Union.” (§ 38561, subd. (c).)[12] Tellingly, the trial court also found as follows: “In . . . March of 2006, five months before AB 32 was enacted, the State of California’s Climate Action Team submitted a report to the Governor and the Legislature noting that in a ‘market-based program’ for reducing GHG emissions, ‘[e]mission allowances can be auctioned (i.e., sold) or given away.’ [Citations.] It is therefore reasonable to assume that the Legislature understood the phrase ‘distribution of emissions allowances’ to potentially encompass both giving away allowances and selling them via an auction or direct sale. It follows that, having broadly delegated the choice of distribution methods to [the Board], if the Legislature had meant to exclude the sale of allowances, it would have said so.” (Italics added.)
We agree. The Act itself references the climate action team. (See § 38501, subd. (i).) The team’s report—provided to the Legislature before the Act was passed—explains that “[w]hen allowances are given to entities covered by the cap, those entities receive something of value: the emission allowances. When the allowances are auctioned, the government collects a portion of the value of the allowances in the amounts paid in the auction.” (Cal. Environmental Protection Agency, Climate Action Team Report to Gov. Schwarzenegger and the Legislature (Mar. 2006) p. 74 <http://www. climatechange.ca.gov/climate_action_team/reports/2006report/2006-04-03_FINAL_CAT_REPORT.PDF> [as of Apr. 6, 2017].) It also explains a hybrid approach, where some allowances are sold and some are auctioned, the model ultimately adopted by the Board. Thus, the Legislature knew that an auction was a possible component of a cap-and-trade program. If the Legislature had wanted to direct who would receive the constraint *625 value if the Board chose a cap-and-trade system, it was free to do so, but did not. Thus, it seems clear that the Legislature meant for the Board to decide whether to create a cap-and-trade system including an auction for some emissions allowances.[13]
2. Lack of Discussion in the Legislative Record
Plaintiffs assert that the power to create a program generating billions of dollars in revenue would not have been delegated to an agency without explicit discussion, and no such discussion appears in the legislative record. (See In re Christian S. (1994) 7 Cal.4th 768, 782 [30 Cal.Rptr.2d 33, 872 P.2d 574] [“We are not persuaded the Legislature would have silently, or at best obscurely, decided so important and controversial a public policy matter”]; Ailanto Properties, Inc. v. City of Half Moon Bay (2006) 142 Cal.App.4th 572, 589 [48 Cal.Rptr.3d 340] [“The Legislature ‘does not, one might say, hide elephants in mouseholes’ ”]; FDA v. Brown & Williamson Tobacco Corp. (2000) 529 U.S. 120, 160 [146 L.Ed.2d 121, 151, 120 S.Ct. 1291] [“we are confident that Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion”].) Plaintiffs’ point is that the statutory authority to create a “distribution” system could not encompass a multibillion dollar administratively created program. NAM adds that the dearth of explicit discussion “is particularly stark because” of the Legislature’s unique role in collecting and distributing state revenue. (See In re Attorney Discipline System (1998) 19 Cal.4th 582, 595 [79 Cal.Rptr.2d 836, 967 P.2d 49] [“ ‘the power to collect and appropriate the revenue of the State is one peculiarly within the discretion of the Legislature’ ”].)
We disagree that the lack of discussion of an auction means the Legislature precluded its adoption by the Board. First, “[t]he depth of the debate is the domain of the Legislature.” (In re Christian S., supra, 1 Cal.4th at p. 782.) Legislative silence on an issue, or failure to anticipate all *626 ramifications of a bill, does not change the scope of the statutory language. As stated in the context of interpretation of a purportedly ambiguous statute, “ ‘ ‘“[T]hat a statute can be applied in situations not expressly anticipated . . . does not demonstrate ambiguity. It demonstrates breadth.” ’ ” (Estate of Earley (2009) 173 Cal.App.4th 369, 376 [92 Cal.Rptr.3d 577].) As we have discussed (see pt. 1B.1., ante), the Act is worded broadly enough so as to encompass an administratively created auction, which was foreseeable based on material available to the Legislature.
Second, the Act reflects the Legislature’s desire for a massive, historic, and immediate change in behavior regarding GHG emissions. The Legislature could have spent many years considering, analyzing, and dictating the best way to achieve its ambitious goals. But that delay itself would have impeded the goals. Instead, the Legislature chose to pass a flexible bill, with the understanding that the Board, as the agency with expertise in air quality matters, was better equipped to study the problem and design a program to effectuate those goals. (See Jones, supra, 2 Cal.5th at p. 390.) Viewed in this light, the lack of explicit legislative discussion of one subcomponent of one possible emissions reduction system (that is, adoption of a cap-and-trade program rather than a command-and-control program) is of no moment.
3. Structure of Other Cap-and-trade Programs
Plaintiffs contend that other cap-and-trade programs distribute all allowances for free, or are revenue neutral, or arose with explicit legislative authorization for auctions. We accept these asserted facts as true.
But the fact that other methods of distribution were possible is not compelling, or even noteworthy. As the trial court pointed out, our Legislature did not mandate a cap-and-trade program, therefore it had no need to detail the minutiae of such a program. While the Legislature knew how other jurisdictions tackled GHG emissions problems, it was not compelled to follow in lockstep. Neither was the Board.
4. Administrative Fee Provision
Although the parties discuss at length an administrative fee provision in the Act, we find that provision irrelevant to the legislative delegation question.
The provision, section 38597, allows the Board to adopt ‘“a schedule of fees to be paid by the sources of [GHG] emissions regulated pursuant to this division, consistent with Section 57001. The revenues collected . . . shall be deposited into the Air Pollution Control Fund and are available upon appropriation, by the Legislature, for purposes of carrying out this division.” *627 (Stats. 2006, ch. 488, § 1, pp. 3419, 3430.) The cross-referenced statute, which applies to many fees, encourages “efficient and cost-effective operation of the programs” requiring such fees, and requires “that the amount of each fee is not more than is reasonably necessary to fund the efficient operation of the activities or programs for which the fee is assessed.” (§ 57001, subd. (a).)
Plaintiffs contend that the existence of this fee provision precluded the Board from generating any other revenue under the Act by any other mechanism. We disagree.
Section 38597 is a pedestrian measure to pay for the costs of implementing the Act. (See Cal. Code Regs., tit. 17, §§ 95200-95207.) This fee has no bearing on the delegation question. As the trial court put it: “It only proves the Legislature intended to ensure [the Board] could collect fees to pay for the administrative costs directly incurred in carrying out the provisions of [the Act].”
We do not see this as an appropriate usage of the adage expressio unius est exclusio alterius, as contended by some plaintiffs (see People ex rel. Cranston v. Bonelli (1971) 15 Cal.App.3d 129, 135 [92 Cal.Rptr. 828] [“legislative enumeration of certain exceptions by necessary implication excludes all other exceptions”]), because the administrative fee does not speak in any way to the legislative delegation question, and because it is not an exception to a general statutory rule.
5. Floor Debate and Related Statements
Plaintiffs attempt to bolster their contention regarding the administrative fee provision just discussed by referencing floor statements made by the author of the Act, former Assembly Speaker Fabian Núñez.[14] Speaker Núñez assured legislators who expressed qualms about “an open checkbook” for the Board, and “an SUV tax” and the like, that “this bill” authorized only administrative fees to cover program costs. Plaintiffs read much into the Speaker’s usage of the words “this bill” and construe it to mean that the Speaker was promising that no part of the Act would have any other fiscal impact regardless of how it was implemented. But the Speaker was referring to a market system in carbon credits before he made his assurance about program costs. Further—as explained in a February 9, 2012 Legislative Analyst report contained in the joint appendix—a carbon tax would not function like a cap-and-trade program with an auction component, and this *628 report outlined alternatives the Legislature could choose if it disagreed with the Board’s rulemaking decisions.[15] The Legislature did not disagree.
The enrolled bill report prepared by the Board states: "‘Fee Authority. AB 32 grants [the Board] the authority to adopt a schedule of fees to be paid by regulated GHG emission sources for program administration. Republicans feel that the fee authority language provides [the Board] with carte blanche authority to collect fees on anything including imposing a tax on sport utility vehicles (SUV). To clear confusion, Speaker Núñez added a letter to the file to clarify that the fee is limited to [the Board’s] direct implementation costs only.” (State Air Resources Bd., Enrolled Bill Rep. on Assem. Bill No. 32 (2005-2006 Reg. Sess.).) The referenced letter by Speaker Núñez referred only to the administrative fee provision, section 38597.
A later portion of the enrolled bill report, discussing expected fiscal impact, states in part: ‘“While [the Board] has the authority to adopt a schedule of fees to be paid by regulated GHG emitters, two matters need to be resolved before this authority can be exercised. First, the Governor made a policy commitment not to impose additional costs on industry beyond their own costs of compliance. Second, collection mechanisms need to be created (i.e. through mandatory reporting regulations which [come] in 2008). Similarly, regulatory development activity needs to get off the ground before the universe of regulated facilities and the appropriate schedule of fees can be determined.” (State Air Resources Bd., Enrolled Bill Rep. on Assem. Bill No. 32 (2005-2006 Reg. Sess.).) But when this passage was drafted, it was not known whether or not the Board would create a cap-and-trade program at all, therefore the omission to discuss the then-hypothetical impact of auctioning allowances is understandable. Nor does the Governor’s purported policy commitment change the Act.
CalChamber refers to the Governor’s proposed signing statement, prepared by the Board. It provides in part: ‘“I want to join the Speaker in assuring that any fees that may be collected from sources of global warming emissions will only be used to support the essential and direct program costs associated with the bill.” This, too, appears to be reference to the administrative fee provision.[16]
*629 None of these statements individually, nor all of them in combination, speak to the Board’s ability to adopt an auction component within its cap-and-trade program.
Further, as we explain in part II, post, the auction sales are not “fees,” they are the purchase price of a valuable commodity, an emissions allowance, therefore discussion of limiting fees in the legislative record is unpersuasive.
6. Lack of Guidance for Disposing of Auction Proceeds
In 2012 the Legislature passed four bills that specified how the auction proceeds would be used to effectuate the Act (see ante, p. 618). In echo of their earlier argument, plaintiffs observe that the Act itself did not address the disposition of auction revenue. But there was no need for the Act to address the disposition of auction proceeds, because it was then unknown whether the Board would create a cap-and-trade program, rather than what the record calls a “command-and-control” program, that would have mandated emissions reductions by regulatory order. (See Alliance of Small Emitters/Metals Industry v. South Coast Air Quality Management Dist. (1997) 60 Cal.App.4th 55, 57-59 & fn. 1 [70 Cal.Rptr.2d 54] [describing an early “command and control” program converted to a market-based cap-and-trade program, and making reference to the theoretical use of an auction system, although that program did not use an auction].)[17]
As we have said, that a bill has unknown or unanticipated consequences does not mean those consequences, when manifested, must be deemed to conflict with or exceed the scope of the legislation. (See Estate of Earley, supra, 173 Cal.App.4th at p. 376.)
7. Unenacted 2009 Bill
Morning Star points to the failure of Senate Bill No. 31 (2009-2010 Reg. Sess.), which would have explicitly authorized auctions, as evidence of *630 legislative intent. (See Sen. Bill No. 31 (2009-2010 Reg. Sess.) § 2, as amended Jan. 25, 2010.) We have explained that ‘“[t]he unpassed bills of later legislative sessions evoke conflicting inferences. Some legislators might propose them to replace an existing prohibition; others to clarify an existing permission. A third group of legislators might oppose them to preserve an existing prohibition, and a fourth because there was no need to clarify an existing permission. The light shed by such unadopted proposals is too dim to pierce statutory obscurities. As evidences of legislative intent they have little value.” (Sacramento Newspaper Guild v. Sacramento County Bd. of Suprs. (1968) 263 Cal.App.2d 41, 58 [69 Cal.Rptr. 480]; cited with approval by Dyna-Med, Inc. v. Fair Employment & Housing Com. (1987) 43 Cal.3d 1379, 1396 [241 Cal.Rptr. 67, 743 P.2d 1323].)
The limited circumstances under which an unenacted bill is relevant, such as where the Legislature has studied an issue or court ruling and thereafter declines to change the law or adopt a new proposal (see, e.g., Western Land Office, Inc. v. Cervantes (1985) 175 Cal.App.3d 724, 741 [220 Cal.Rptr. 784]; Seibert v. Sears, Roebuck & Co. (1975) 45 Cal.App.3d 1, 17-19 [120 Cal.Rptr. 233]), or passes a bill without a specific provision contained in a prior version of the bill (see, e.g., People v. Hunt (1999) 74 Cal.App.4th 939, 947-948 [88 Cal.Rptr.2d 524]), are not present here. Instead, as in the general run of cases, it may be said only that ‘“the failure of the Legislature to enact the proposed bill, in one form or another, is some evidence that the Legislature does not consider it necessary or proper or expedient to enact such legislation.” (Sterling v. City of Oakland (1962) 208 Cal.App.2d 1, 6 [24 Cal.Rptr. 696].)
Thus, we find that the proposed but unenacted 2009 bill does not assist plaintiffs.[18]
8. Constitutional Doubt
On appeal, plaintiffs raise an eighth point, namely, the ‘“constitutional doubt” canon of construction. They argue that because there are doubts about whether the auction is constitutional—either because of the unlawful delegation claim or because of the tax argument (see pt. II, post)—we should interpret the Act to preclude the auction. Our Supreme Court has described the application of the constitutional doubt canon as follows: “ ‘ ‘“If a statute is susceptible of two constructions, one of which will render it constitutional and the other unconstitutional in whole or in part, or raise serious and doubtful constitutional questions, the court will adopt the construction which, without doing violence to the reasonable meaning of the language used, will *631 render it valid in its entirety, or free from doubt as to its constitutionality, even though the other construction is equally reasonable. [Citations.] The basis of this rule is the presumption that the Legislature intended, not to violate the Constitution, but to enact a valid statute within the scope of its constitutional powers.” ’ ” (Harrott v. County of Kings (2001) 25 Cal.4th 1138, 1153 [108 Cal.Rptr.2d 445, 25 P.3d 649].)
But the canon has a narrow application, as we have recently reemphasized: “The constitutional doubt canon applies if and only if the statute is ‘realistically susceptible of two interpretations and the interpretation to be rejected must raise grave and doubtful constitutional questions.’ [Citation.] It ‘is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress [or, mutatis mutandis, the Legislature,] did not intend the alternative which raises serious constitutional doubts.’ ” (Siskiyou County Farm Bureau v. Department of Fish & Wildlife (2015) 237 Cal.App.4th 411, 445 [188 Cal.Rptr.3d 141] (Siskiyou).)
Under this standard, we find no basis to apply the interpretive canon herein, either as to the delegation question or the Proposition 13 question (see pt. II, post). We have not been offered alternative, plausible, statutory interpretations from which to choose.[19]
9. Conclusion as to Legislative Delegation
For all of the above reasons, we agree with the trial court that plaintiffs have not carried their burden (see California School Bds., supra, 191 Cal.App.4th at p. 544) to show the auction portion of the regulations exceeds the scope of legislative delegation.
C. The 2012 Legislation
The four bills passed in 2012 (see ante, p. 618) show that whatever the collective intention of the 2006 Legislature, the 2012 Legislature affirmatively ratified the Board’s auction system.
1. Legislative Ratification
We have held that “whatever the Legislature has power to authorize to be done it has power to ratify and confirm when done irregularly or not in the mode previously described.” (Rock Creek W. Dist. v. County of Calaveras *632 (1955) 133 Cal.App.2d 141, 146 [283 P.2d 740]; see Southern Cal. Gas Co. v. Public Utilities Com. (1985) 38 Cal.3d 64, 67 [211 Cal.Rptr. 99, 695 R2d 186] [regulations authorized by subsequent legislation; “even if the Legislature cannot ‘confirm’ that such authority always existed ... it may furnish the missing authority nunc pro tunc”].) Contrary to CalChamber’s view, applying the ratification doctrine is not the same as using the acts of a later Legislature to illuminate a prior Legislature’s intent. (See Peralta Community College Dist. v. Fair Employment & Housing Com. (1990) 52 Cal.3d 40, 52 [276 Cal.Rptr. 114, 801 P.2d 357] [“The declaration of a later Legislature is of little weight in determining the relevant intent of the Legislature that enacted the law”].) It instead treats later acts as curative of purported defects in prior acts.[20]
Thus, even were we to find that the Act did not authorize the regulations adopted by the Board, the Legislature surely ratified them in 2012 by directing how the money is spent. (See Professional Engineers in California Government v. Schwarzenegger (2010) 50 Cal.4th 989, 1000 [116 Cal.Rptr.3d 480, 239 P.3d 1186] [although the Governor, at the time he acted, lacked legislative authority to furlough state employees, “the Legislature’s 2009 enactment of the revisions to the 2008 Budget Act operated to ratify the use of the two-day-a-month furlough program”]; see also, e.g., Morning Star, supra, 201 Cal.App.4th at p. 748 [“there is strong evidence the Legislature knows full well” about a regulatory interpretation “and the Legislature is fine with that interpretation. This is strong evidence” the regulation does not conflict with statutory law].) The legislative will to ratify the Board’s auction system by passage of the 2012 statutes is clear, and we need not discuss it further.
2. Proposition 26
Morning Star—but not the other plaintiffs—contends that any reliance on the 2012 statutes to ratify the auction component of the regulations would be invalid under Proposition 26. We disagree.
Proposition 26 was passed by the People, in the exercise of their reserved initiative powers, in response to the perceived efforts of state and local governments to bypass the spirit of Proposition 13 and related measures, in particular by couching exactions as regulatory fees exempt from a superma-jority vote. (See Schmeer v. County of Los Angeles (2013) 213 Cal.App.4th 1310, 1317-1326 [153 Cal.Rptr.3d 352] (Schmeer); Voter Information Guide, Gen. Elec. (Nov. 2, 2010) text of Prop. 26, § 1, p. 114.)
*633 In part, Proposition 26 amended our constitution so that “Any change in state statute which results in any taxpayer paying a higher tax” is subject to the requirement that the change be passed by a two-thirds vote of each legislative house. (Cal. Const., art. XIII A, § 3, subd. (a).) Proposition 26 defines a tax as “any levy, charge, or exaction of any kind imposed by the State” with exceptions. (Cal. Const., art. XIII A, § 3, subd. (b).) In defending against a Proposition 26 challenge, “The State bears the burden of proving by a preponderance of the evidence that a levy, charge, or other exaction is not a tax, that the amount is no more than necessary to cover the reasonable costs of the governmental activity, and that the manner in which those costs are allocated to a payor bear a fair or reasonable relationship to the payor’s burdens on, or benefits received from, the governmental activity.” (Cal. Const., art. XIII A, § 3, subd. (d).)
However, Proposition 26, passed in 2010, is not generally retrospective in operation. (See Brooktrails Township Community Services Dist. v. Board of Supervisors of Mendocino County (2013) 218 Cal.App.4th 195, 205-207 [159 Cal.Rptr.3d 424].) Thus, it cannot affect the Act itself, passed in 2006, and no party—not even Morning Star—contends otherwise.
The arguable relevance is the language broadening the definition of a tax and changing the burden of proof. Morning Star contends that Proposition 26 bars the use of the 2012 legislation to ratify the auction regulations, because the Board has not proven the auction charges are not taxes as defined by Proposition 26.
But the 2012 legislation did not change the cost of allowances, whether purchased at auction or on the secondary market; it specified how the proceeds of auctions sales would be handled. Thus, no “state statute” was changed in any way that could possibly increase “any . . . charge ... of any kind imposed by the State” as provided by Proposition 26. (Cal. Const., art. XIII A, § 3; see Western States Petroleum Assn. v. Board of Equalization (2013) 57 Cal.4th 401, 423-424 [159 Cal.Rptr.3d 702, 304 P.3d 188] [regulation changing method of assessing certain property that resulted in a higher bill for some taxpayers was not a “state statute” within the meaning of Prop. 13]; Southern California Edison Co. v. Public Utilities Com. (2014) 227 Cal.App.4th 172, 198 [173 Cal.Rptr.3d 120] [“Proposition 26 plainly defines a tax as a ‘change in state statute which results in ... a higher tax’ [citation], not [an agency’s] decision” that resulted in a fee].)
Accordingly, Proposition 26 interposes no bar to using the 2012 statutes to evince a legislative ratification of the auction regulations adopted by the *634 Board.[21] We thus must turn to the question of whether Proposition 13 poses an obstacle to the auction component of the Board’s cap-and-trade program.
II

Whether the Auctions Sales Violate Proposition 13

The second question presented to the trial court by plaintiffs was whether the auction system is a tax subject to Proposition 13. The trial court found this to be a close question in part because of the novelty of “the charges at issue,” but ruled the system was more like a regulatory fee than a tax, applying principles derived from Sinclair Paint and related cases, while acknowledging no prior case precisely governed this case.
Although we disagree with its method of analysis, we agree with the trial court’s ultimate conclusion that the auction system does not equate to a tax subject to Proposition 13. This is so for two interrelated reasons: First, the purchase of emissions allowances, whether directly from the Board at auction or on the secondary market, is a business-driven decision, not a governmen-tally compelled decision; second, unlike any other tax to which we have been referred by the parties, the purchase of an emissions allowance conveys a valuable property interest—the privilege to pollute California’s air—that may be freely sold or traded on the secondary market. Thus, the trial court correctly identified the two facts we find make the auction system unlike a tax: (1) participation is voluntary; and (2) entities receive a thing of value in exchange for obtaining allowances.
We discuss the trial court’s thoughtful decision in some detail. Its reasoning drives much of the parties’ briefing and accurately outlines several relevant points.
A. Standard of Review
Under a Sinclair Paint analysis, “Whether [a statute] imposes a tax or a fee [under Proposition 13] is a question of law decided upon an independent review of the record.” (California Farm Bureau Federation v. State Water Resources Control Bd. (2011) 51 Cal.4th 421, 436 [121 *635 Cal.Rptr.3d 37, 247 P.3d 112] (Farm Bureau).) The challenger must “establish a prima facie case showing that the fee is invalid.”[22] (Farm Bureau, at p. 436.) Then the state must show the estimated costs of the service or regulatory activity and method of apportionment, to establish the “ ‘ “charges allocated to a payor bear a fair or reasonable relationship to the payor’s burdens on or benefits from the regulatory activity.” ’ ” (Id. at pp. 436-437; see Sinclair Paint, supra, 15 Cal.4th at p. 878.) This allocation of burdens presupposes that Sinclair Paint applies to the charge; whether it applies is a purely legal question.
B. Proposition 13 and the Trial Court’s Ruling
1. Proposition 13 and Its Aftermath
The language of Proposition 13 most relevant to this case is as follows: “[A]ny changes in State taxes enacted for the purpose of increasing rates or changes in methods of computation must be imposed by an Act passed by not less than two-thirds of all members elected to each of the two houses of the Legislature . . . .” (Cal. Const., art. XIIIA, former § 3, italics added, added by initiative, Primary Elec. (June 6, 1978), popularly known as the “Jarvis-Gann initiative” [see Mills v. County of Trinity (1980) 108 Cal.App.3d 656, 658 [166 Cal.Rptr. 674] (Mills)], and sometimes referred to as the “People’s Initiative to Limit Property Taxation” [see Farm Bureau, supra, 51 Cal.4th at p. 428, fn. 1].)[23]
Proposition 13 was designed to provide tax relief, but purported loopholes were found, leading to later initiative measures to limit the use of regulatory fees in lieu of taxes. (See Schmeer, supra, 213 Cal.App.4th at pp. 1317-1326 [discussing history of various subsequent measures].) Sinclair Paint set forth rules to evaluate purported regulatory fees to determine if they were in reality taxes subject to Proposition 13.
Sinclair Paint involved a program to remediate the effects of lead, funded by fees imposed on entities who contributed to lead contamination. (Sinclair Paint, supra, 15 Cal.4th at p. 872.) The court held the act “imposes bona fide regulatory fees. It requires manufacturers and other persons whose products have exposed children to lead contamination to bear a fair share of the cost of mitigating the adverse health effects their products created in the community. Viewed as a ‘mitigating effects’ measure, it is comparable in character to *636 similar police power measures imposing fees to defray the actual or anticipated adverse effects of various business operations.” (Id. at p. 877.)
“Sinclair Paint stated that regulatory fees that do not exceed the reasonable cost of providing the services for which the fees are charged and are not levied for any unrelated revenue purposes” were not subject to section 4 of Proposition 13, which defined ‘“special taxes” and which the court viewed as bearing on the proper application of section 3 of Proposition 13, applicable to state taxes. (Schmeer, supra, 213 Cal.App.4th at pp. 1321-1322; see Sinclair Paint, supra, 15 Cal.4th at pp. 873-880.)
Acknowledging that the word “tax” has no fixed meaning (see Mills, supra, 108 Cal.App.3d at p. 660), Sinclair Paint found the lead paint fee should be analyzed as a regulatory fee imposed under the police power, which is not deemed a special tax provided that the fees (1) do not exceed the reasonable cost of accommodating the activity and (2) are not levied for unrelated revenue purposes. (Sinclair Paint, supra, 15 Cal.4th at pp. 875-876; see California Building Industry Assn. v. San Joaquin Valley Air Pollution Control Dist. (2009) 178 Cal.App.4th 120, 131 [100 Cal.Rptr.3d 204] (Building Industry).)
Sinclair Paint left open the possibility the challenger could show either that the amount of fees “exceeded the reasonable cost of providing the protective services for which the fees were charged, or that the fees were levied for unrelated revenue purposes” or “that no clear nexus exists between its products and childhood lead poisoning, or that the amount of the fees bore no reasonable relationship to the social or economic ‘burdens’ its operations generated.” (Sinclair Paint, supra, 15 Cal.4th at p. 881; see California Assn. of Prof. Scientists v. Department of Fish & Game (2000) 79 Cal.App.4th 935, 945 [94 Cal.Rptr.2d 535] {Scientists) [state must show “(1) the estimated costs of the service or regulatory activity, and (2) the basis for determining the manner in which the costs are apportioned, so that charges allocated to a payor bear a fair or reasonable relationship to the payor’s burdens on or benefits from the regulatory activity”].)
2. The Trial Court’s Ruling
The trial court correctly observed that, generally, taxes are compulsory, “enforced contributions ... for the support of the government.” But, acknowledging that the term “tax” had no fixed meaning, the trial court found cases “distinguishing ‘taxes’ from ‘fees’ provide helpful guidance. The cases have recognized several general categories of compulsory fees or charges that are distinguishable from taxes .... These categories are: (1) special assessments and related business charges, (2) development fees, (3) user fees, *637 and (4) regulatory fees.” The trial court discussed cases analyzing charges under these four categories, and reasoned as follows:
‘“[T]he charges are like a development fee in that they are used to mitigate impacts related to the fee payer’s business operations. However, unlike a development fee, the charges are not imposed in return for the privilege of developing land, and the amount of the charge is not tied to the individual payer’s impact on the community.
‘“Like a user fee, those who purchase allowances receive something that is not received by those who do not pay—a tradable right to emit GHG. However, unlike a user fee, the charges are not imposed to offset the cost of a government product or service.
‘“Like a regulatory fee, the charges are collected as part of a regulatory program and the funds collected are used to carry out regulatory activities. However, unlike a traditional regulatory fee, the charges are not intended to shift the costs of a specific regulatory program. . . . The proceeds of the sales will be used to pay for a wide range of (as-yet-undetermined) regulatory programs (ostensibly) related to AB 32.”
The trial court outlined four points militating in favor of finding a tax, as follows:
(1) The ‘“charges are not entirely voluntary” because the ‘“covered entity either must reduce its GHG emissions to zero—which, generally speaking, is impractical or impossible—or acquire allowances.” Further, the court thought ‘“the purchase of allowances is little different from an emissions tax.”
(2) “[A]n allowance has no value independent of the regulatory scheme. While those who purchase allowances may be said to acquire a ‘benefit’ vis-a-vis other covered entities, they do not acquire any ‘benefit’ vis-a-vis other (non-covered) entities, which retain the right to freely emit GHGs without the need for acquiring any allowances.”
(3) ‘“[T]he amount charged is determined, at least in part, by government fiat. Although the auction relies on bidding, there is only one round of bidding, using sealed bids, and the auction operator will not accept bids that fall below a pre-set ‘auction reserve price.’ The auction reserve price is a ‘price floor’ set by ‘government fiat.’ In addition, sales of allowances from the ‘containment reserve’ are sold at prices fixed by the government. Moreover, by definition, the government has artificially constrained the supply of allowances—indeed, this is the very purpose of the ‘cap.’ Thus, it is not factually accurate for [the Board] to claim that the price ... is determined by the ‘market.’ ”
*638 (4) “Under the [2012] legislation, the proceeds must be used to further AB 32’s regulatory goal .... However, since nearly every aspect of life has some impact on GHG emissions, it is difficult to conceive of a regulatory activity that will not have at least some impact on GHG emissions.”[24]
Next, the trial court outlined four correlative points weighing against finding a tax:
(1) The allowances have “economic value and can be traded,” and “[i]f the atmosphere’s capacity to assimilate GHGs is viewed as a limited public resource, selling emissions allowances can be analogized to selling a right to use a public resource, similar to a hunting [or] fishing license, a mineral extraction permit, or a wireless electromagnetic spectrum license.”
(2) “[T]he purchase of allowances is, in some respects, voluntary. Because covered entities receive a significant portion of the allowances for free, covered entities have some control over when, and perhaps if, they participate in sales of allowances. Covered entities may be able to reduce their GHG emissions to reduce or completely avoid their need to purchase . . . allowances. Further, [they] are not compelled to purchase allowances from the [Board].” (Fn. omitted.)
(3) “[T]he price of allowances is determined at least in part by market forces.”
(4) The proceeds will further the regulatory purposes of the Act “and the charges were imposed (ostensibly, at least) for regulatory purposes.”
Ultimately, the trial court found (1) “the primary purpose of the charges is regulatory,” (2) the “fees collected will not exceed the costs of the regulatory activities” because revenue will advance the Act’s goals, and (3) given that “the charges are a byproduct of the implementation of a regulatory program”[25] and the “proceeds are received in exchange for the purchase of a *639 [valuable,] tradable right to emit GHGs,” a sufficient “reasonable relationship” exists between the charges “and the covered entities’ (collective) responsibility for the harmful effects of GHG emissions.” Thus, the trial court found no Proposition 13 violation.
C. The Auction of Allowances Is Not a Tax
We shall first explain why we are not bound to apply the Sinclair Paint test to assess the legality of the auction system. (Pt. IIC.l., post.) We then describe the twin traditional hallmarks of a tax; a tax is (1) a compulsory exaction that (2) confers nothing of particular benefit to the payor. (Pt. IIC.2., post.) We next explain why the purchase of allowance credits, either directly via Board auction or indirectly via the secondary market, is not compulsory. (Pt. IIC.3., post.) We then explain why the emissions allowances constitute valuable property rights—albeit only as between private parties. This valuable property right consists of the privilege to pollute California’s air, a privilege no party has a vested right to continue doing. (Pt. IIC.4., post.) We conclude that the auction system created by the Board is part of the market-based distribution system the Board was charged with developing, and the choice to participate in that market does not equate to a tax payment. (Pt. IIC.5., post.) Finally, we briefly address the use of the auction revenue, discussed in detail in the briefing, and explain that we need not decide the propriety of any specific expenditure in this case. (Pt. IIC.6., post.)
1. Sinclair Paint Does Not Control This Case
We reject Morning Star’s claim, echoed by others, that Sinclair Paint “established criteria that lower courts must use to determine whether a revenue generating measure is a tax under Proposition 13 or a regulatory fee.” (Italics added.) Sinclair Paint did not hold that its analysis applied to any “revenue generating measure.” Instead, it analyzed whether the exaction at issue was exempt from Proposition 13 as a purported regulatory fee. (Sinclair Paint, supra, 15 Cal.4th at p. 870; see Tomra Pacific, Inc. v. Chiang (2011) 199 Cal.App.4th 463, 487 [131 Cal.Rptr.3d 743] [Sinclair Paint “set out guidelines for determining whether a denominated fee is, in fact, a bona fide regulatory fee and not a disguised tax.”].) As the Board pointed out in oral argument, Sinclair Paint did not create “a binary world” where every payment to the government must be either a fee or a tax. The Board’s regulations do not purport to impose a regulatory fee on polluters, but instead *640 call for the auction of allowances, a different system entirely. (Cf. San Diego Gas & Electric Co. v. San Diego County Air Pollution Control Dist. (1988) 203 Cal.App.3d 1132, 1148 [250 Cal.Rptr. 420] [nontradable fees imposed on polluters upheld in part because “[a] reasonable way to achieve Proposition 13’s goal of tax relief is to shift the costs of controlling stationary sources of pollution from the tax-paying public to the pollution-causing industries themselves”].) Because the issue is different, Sinclair Paint does not control and we are not compelled to apply its test. (17) Cases are not authority for propositions not considered therein. (Siskiyou, supra, 237 Cal.App.4th at p. 437, fn. 11.)
Morning Star points to Senate Bill No. 957 (2011-2012 Reg. Sess.), a proposed budget act, which in part would have found ‘“the funds generated by the [cap-and-trade] program are regulatory fees that conform with” Sinclair Paint. (Sen. Bill No. 957 (2011-2012 Reg. Sess.) as introduced Jan. 10, 2012, § 15.11, subd. (c).) But Senate Bill No. 957 died and therefore is meaningless. (See Order of Conductors v. Swan (1947) 329 U.S. 520, 529 [91 L.Ed. 471, 478, 67 S.Ct. 405].) Instead, the Budget Act of 2012 (Assem. Bill. No. 1464 (2011-2012 Reg. Sess.)) included language ensuring the money would be spent on projects to reduce GHG, and contains no reference to Sinclair Paint. (See Stats. 2012, ch. 21, § 15.11.)
In a related claim, CalChamber points to a Legislative Counsel opinion purportedly concluding any auction system would have to pass muster under Sinclair Paint. Although two Legislative Analyst reports in the record refer to such a Legislative Counsel opinion, the opinion is not in the record, and the Legislative Counsel’s supervising librarian has advised this court that no publicly available opinion on that subject has been issued. Thus, although CalChamber seeks support in that purported opinion, because its reasoning is unknown, it lacks any persuasive value. (Cf. Pacific Gas & Electric Co. v. Zuckerman (1987) 189 Cal.App.3d 1113, 1135, 1136 [234 Cal.Rptr. 630] [the value of expert opinion rests ‘“in the factors considered and the reasoning employed”].)
In short, we reject the claim that Sinclair Paint controls this case.
2. Hallmarks of a Tax
Having concluded the Sinclair Paint test does not apply, we must next consider what test does apply to ascertain whether a tax is being imposed. Although the term “tax” has different meanings in different contexts, we find that, generally speaking, a tax has two hallmarks: (1) it is compulsory, and (2) it does not grant any special benefit to the payor.
Lirst, “The word tax, in its common acceptation, denotes some compulsory exaction, which a government makes upon persons or property within its *641 jurisdiction, for the supply of the public necessities.” (People v. Naglee (1850) 1 Cal. 232, 253, italics added; see Sinclair Paint, supra, 15 Cal.4th at p. 874 [‘“Most taxes are compulsory rather than [a] response to a voluntary decision to develop or to seek other government benefits or privileges”].)
Such voluntariness concerns have arisen in development fee cases. One case involved a local scheme “referred to as indirect source review (ISR) . . . intended to encourage developers to reduce indirect pollution, i.e., mobile source emissions, caused by new development projects. Under ISR, the developer can reduce emissions by incorporating pollution-reducing features in the project, or by paying a fee to fund offsite projects that will reduce emissions, or by a combination of the two.” (Building Industry, supra, 178 Cal.App.4th at pp. 124-125.) “A developer can accomplish the required emission reductions onsite by incorporating measures to reduce vehicle miles traveled, vehicle trips and/or areawide sources of emissions such as fireplaces, wood stoves and landscape equipment. Alternatively, the emissions can be reduced through paying a fee to fund offsite emission reducing projects. Finally, the developer can use a combination of onsite emission reduction measures and a fee to fund offsite emission reduction projects.” (Id. at p. 128, italics added.) It has also been held that “Whereas taxes are compulsory in nature, development fees are imposed only if a developer elects to develop.” (California Bldg. Industry Assn. v. Governing Bd. (1988) 206 Cal.App.3d 212, 236 [253 Cal.Rptr. 497], italics added.) Similarly, “Regulatory fees are not compulsory. Rather, fee payers have some control both over when, and if, they pay any fee, i.e., when or if they elect to engage in a regulated activity, and/or the amount of the fee they are compelled to pay. For example, fee payers can modify their conduct to pollute less or consume less water.” (Building Industry, supra, 178 Cal.App.4th at p. 132, italics added; see Scientists, supra, 79 Cal.App.4th at pp. 949-950 [describing a prior regulatory fee case, where it was important that “the payors had some control over the amount of the regulatory fee they were compelled to pay by the degree to which their respective activities impacted the environment. The more they polluted the air and consumed the water, the more they paid”].)
Second, as Witkin succinctly puts it, “no compensation is given to the taxpayer except by way of governmental protection and other general benefits.” (9 Witkin, Summary of Cal. Law (10th ed. 2005) Taxation, § 1, p. 25, italics added.) Taxation “promises nothing to the person taxed beyond what may be anticipated from an administration of the laws for individual protection and the general public good.” (71 Am.Jur.2d, supra, State and Local Taxation, § 6, p. 307; see Cooley, supra, Taxes, Their Nature and Kinds, p. 3 [in exchange for enforced contributions, “the state is supposed to make adequate and full compensation, in the protection which it gives to his life, liberty and property, and in the increase to the value of his possessions, by the use to which the money contributed is applied” (fn. omitted)]; Arnold v. *642 City of Knoxville (1905) 115 Tenn. 195 [90 S.W. 469] [quoting Cooley]; Schulz v. Dixon County (1938) 134 Neb. 549 [279 N.W. 179] [similar].)
Our Supreme Court has similarly characterized the general nature of taxation: “Ordinarily taxes are imposed for revenue purposes and not ‘in return for a specific benefit conferred or privilege granted.’ ” (Farm Bureau, supra, 51 Cal.4th at p. 437, quoting Sinclair Paint, supra, 15 Cal.4th at p. 874.)
Thus, in considering whether the auction system represents a tax of some sort, we first consider whether participation therein by covered entities is compulsory, and then consider whether and to what extent participants receive anything of particular value for their payment.
3. Participation in the Auction Is Voluntary
Plaintiffs and allied amici curiae posit the view that participation in the auction sales or secondary emissions allowances market is compulsory. We reject this view.
As intervener EDF points out, “Regulated entities can comply with the cap-and-trade rule without participating in the auction or reserve, including by reducing emissions, purchasing allowances from third parties, using banked allowances from prior years, and purchasing [or earning] emission offsets (credits generated from voluntary emission reductions made outside the capped sectors).”
As shown by materials in the Board’s initial and unopposed request for judicial notice, noncovered entities buy allowances, either to speculate, or to retire them and reduce emissions. (See 1 New Palgrave Diet, of Economics & Law (1998) p. 127 [“The bids in the US pollution-rights auctions also revealed another kind of valuation. Environmental groups submitted bids; by winning the bidding they ensured that those [licenses] would not be utilized”].) NAM concedes that some nonemitters buy allowances “to retire them.” That fact cuts sharply against the view that the auction is compulsory, because, as EDF notes, “Taxes do not attract volunteers.”
It is not necessary to obtain extra allowances or offset credits unless an entity chooses to pollute beyond a certain level, something the government does not compel it to do. (See Building Industry, supra, 178 Cal.App.4th at p. 132 [entities “can modify their conduct to pollute less”].) Indeed, the whole point of the Act is to stop entities from polluting excessively.
Morning Star, echoed by other plaintiffs and allied amici curiae, argues that in order to stay in business in California it must obtain a sufficient number of *643 emissions allowances from somewhere. Because Morning Star does not receive all the required emissions allowances free of charge from the Board, it must obtain them through other means, which it views as “a necessary cost of staying in business in California.” In Morning Star’s view, it is “compelled” to purchase allowances, shut down, or move out of state. Morning Star asserts it is impossible for it to operate without allowances given current technology, it would be more expensive to buy allowances on the secondary market, and therefore it is “both false and ridiculous” to deem allowance purchases to be voluntary.
In support of its petition, Morning Star submitted a declaration by an employee, which we have referred to as the “Rabo” declaration in our request for supplemental briefing. Taking its contents as true, which we shall do for purposes of this opinion,[26] it establishes as follows:
Janet Rabo is an economist employed by Morning Star, and her duties include analyzing data “in connection with domestic tomato processing plants and farming operations as well [as] international economics affecting Morning Star’s businesses.” A key responsibility is ensuring compliance with the Act, including bidding at auctions to obtain allowances. Morning Star has three tomato processing plants in California that account for 25 percent of California processed tomato production and 40 percent of the nationwide ingredients for tomato paste and diced tomatoes. Morning Star uses natural gas to process tomatoes, but does not receive enough free allowances, and Rabo knows of no “cost-effective” means to reduce emissions. In her view, purchasing allowances on the open market will “be far more expensive” than purchasing them at auction from the Board. In her ultimate view—which is in reality a *644 legal conclusion rather than an expert opinion—it is “both false and ridiculous” to assert that participation in the auction is voluntary.
We agree that compliance with the cap-and-trade program may increase the cost of doing business in California for covered entities such as Morning Star. But Rabo does not explain why Morning Star cannot absorb the increased cost of doing business or mitigate the increase in some other fashion. As the Board pointed out at oral argument, a covered entity has a menu of options to achieve compliance, as we have referenced ante. Rabo does not describe any potential mechanism to recoup costs nor why any efforts to recoup costs would fail or prove insufficient. Although Morning Star may ultimately make the business decision that it must pay for allowances in order to maintain its operations in California, making the business decision to pay is not the same as being compelled to do so by the state.[27]
The fact that some businesses may choose not to participate in the program and may instead choose to leave the state is a potential side effect which the Act itself contemplates. (See § 38562, subd. (b)(8).) But the possibility of leakage lends no weight to the argument that the cap-and-trade scheme amounts to a tax. A number of requirements for businesses, whether taxes, safety regulations, minimum wage statutes, or command-and-control pollution control regulations, might cause a particular business to become unprofitable. This unfortunate reality does not translate into a compelled purchase of auction credits.
Compliance instruments are “demanded only as often as a party of his own accord, chooses to perform certain acts.” (People v. Naglee, supra, 1 Cal. at p. 253.) This is similar to the rationale supporting exaction of developer fees, which require a developer to dedicate land or pay impact fees for the privilege of new development, which exactions are not viewed as compulsory. (See Trent Meredith, Inc. v. City of Oxnard (1981) 114 Cal.App.3d 317, 328 [170 Cal.Rptr. 685] [“Even though the developer cannot legally develop without satisfying the condition precedent, he voluntarily decides whether to develop or not to develop”]; Kern County Farm Bureau v. County of Kern *645 (1993) 19 Cal.App.4th 1416, 1423 [23 Cal.Rptr.2d 910]; Russ Bldg. Partnership v. City and County of San Francisco (1987) 199 Cal.App.3d 1496, 1505 [246 Cal.Rptr. 21].)
Albeit not explicitly, plaintiffs seem to rely on the foundational premise that covered entities have some vested right to continue polluting California’s air without paying for the privilege to do so. Therefore, in their view, compelling them to incur costs for engaging in “business as usual” is somehow compulsory. For example, Morning Star asserts that “the only ‘benefit’ successful bidders receive here is the requirement to pay for what they had been doing before for free.” Although this observation may well be accurate, Morning Star does not support its theory that bidders ever had the right to pollute for free. They did not. As EDF points out, the Board could instead have imposed a declining cap on Morning Star’s emissions under a command-and-control system and ordered Morning Star to stop emitting GHGs beyond a certain amount.[28] However, under the auction system, Morning Star has more options. It can continue polluting the environment as much as it was before, except that now it must pay for the privilege of doing so. The right to continue polluting is a substantial benefit; that Morning Star was previously allowed to pollute for free does not change that fact. Contrary to suggestions by plaintiffs, implicit or otherwise, there is no vested right to pollute in California. (See, e.g., Communities for a Better Environment v. South Coast Air Quality Management Dist. (2010) 48 Cal.4th 310, 323-324 [106 Cal.Rptr.3d 502, 226 P.3d 985] (Communities); Hardesty v. Sacramento Metropolitan Air Quality Management Dist. (2011) 202 Cal.App.4th 404, 414-416, 427 [136 Cal.Rptr.3d 132].)
As another court observed: “Here it appears the Oil Companies are asking us to determine they have a fundamental vested right to release gasoline vapors while dispensing fuel to their customers. How are we to answer the public, on the other hand, who assert a fundamental vested right to breathe clean air? If either exists, it must be the latter. We are not presented with the enforcement of a rule which effectively drives the Oil Companies out of business. At most it puts an economic burden on them increasing the cost of doing business.” (Mobil Oil Corp. v. Superior Court (1976) 59 Cal.App.3d 293, 305 [130 Cal.Rptr. 814], italics added (Mobil Oil); see Building Industry, supra, 178 Cal.App.4th at p. 132.) As we explain more fully in the next section, the right to pollute is a valuable privilege for which a cost may properly be imposed.
*646 4. Allowance Credits Are Valuable Commodities
The purchase of an allowance, whether at auction or in the secondary market, conveys a valuable asset—the privilege to pollute the air. This is unlike any tax we know. As EDF contends, “unlike taxes, which offer no discrete benefits to the payers, the auction and reserve provide participants valuable, tradable emission allowances as consideration for the purchase price. They may be used for current compliance, banked for future compliance, or sold, each of which returns value to the holder. Because participants’ bids presumably reflect the value they ascribe to the allowances, the revenue generated by the auction and reserve will not exceed the aggregate value to purchasers of the allowances sold.”
Under the Board’s regulatory definitions, “ ‘Property Right’ means any type of right to specific property whether it is personal or real property, tangible or intangible.” (Cal. Code Regs., tit. 17, § 95802, subd. (a)(299).) A compliance instrument is an offset credit or emissions allowance. (Id., § 95802, subd. (a)(69).) A substantive regulation provides: “Each compliance instrument issued by the Executive Officer represents a limited authorization to emit up to one metric ton in CO2e of any greenhouse gas specified in section 95810, subject to all applicable limitations specified in this article. No provision of this article may be construed to limit the authority of the Executive Officer to terminate or limit such authorization to emit. A compliance instrument issued by the Executive Officer does not constitute property or a property right.” (Id., § 95820, subd. (c), italics added.)
Although, when read in isolation, these regulations could be interpreted to mean that emissions allowances do not constitute property or a property right, when examined in context it becomes clear that this passage refers only to property rights as against the state, not rights as between private parties. A “property right” can mean different things in different contexts. For example, a winemaker received federal “COLAs” or certificates of label approval, which purported to allow the use of “Napa” on wine labels where the wine was produced from grapes not grown in Napa Valley. A California statute prohibited the use of misleading geographic names on wine labels. (See Bronco Wine Co. v. Jolly (2004) 33 Cal.4th 943, 950-956 [17 Cal.Rptr.3d 180, 95 P.3d 422] [holding state labeling statute was not preempted by federal law].) We upheld the state statute as against a claim that it effected a taking of a property right conferred by the federal COLAs. (Bronco Wine Co. v. Jolly (2005) 129 Cal.App.4th 988, 1029-1033 [29 Cal.Rptr.3d 462] (Bronco Wine).) In doing so, we distinguished between property rights for purposes of a takings analysis and property rights for purposes of a procedural due process analysis, finding that the latter embraces a broader conception of property rights:
*647 “In determining whether permits or licenses are property, the courts consider whether the permit or license is transferable, the extent to which the government has the right to regulate the underlying activity, or to revoke, suspend, or modify the permit or license, and whether there has been a legislative or regulatory expression that issuance of the permit does not create a property right. [Citation.]
“Considering these hallmarks of property, the courts generally have found that licenses and permits do not constitute property rights for purposes of the takings clause. [Citations.] However, where a license bears the hallmarks of property, it has been held to be a protectable property right. [Citation.] [¶] ■ ■ -'[¶]
“Contrary to the assumption in [a prior case], the due process and takings clause concepts of property are not coterminous. The due process clause recognizes a wider range of interests in property. [Citations.]” (Bronco Wine, supra, 129 Cal.App.4th at p. 1031, italics added.)
This distinction between property rights for purposes of a takings analysis—that is, property rights as between the government and an individual— and property rights as between private individuals, has been articulated in cases analogous to this one.[29]
We have previously held that: “In California, the right to pollute the air can be bought and sold. Air quality management districts have created a valuable commodity, the emission reduction credit (ERC). The ERC is evidenced by transferable certificates approved, banked, and issued by the districts. Simply put, a polluter who pollutes less can sell the ERC to allow the purchaser to pollute more.” (Jopson v. Feather River Air Quality Management Dist. (2003) 108 Cal.App.4th 492, 494 [133 Cal.Rptr.2d 506], italics added (Jopson).) The regulatory system in Jopson follows the cap-and-trade model adopted by the Board, rather than a command-and-control model, and in that model, transferability of allowances conveyed value.
Similarly, by statute, federal Clean Air Act (42 U.S.C. § 7401 et seq.) allowances—analogous to GHG allowances under the Board’s regulations— are said to confer no property rights: “An allowance allocated under this subchapter is a limited authorization to emit sulfur dioxide in accordance with the provisions of this subchapter. Such allowance does not constitute a property right.” (42 U.S.C.A. § 7651b(f), italics added.) However, despite this *648 language, very similar to the regulation governing allowances under the Act (Cal. Code Regs., tit. 17, § 95820, subd. (c) [“A compliance instrument . . . does not constitute property or a property right”]), the transferability of such allowances made them valuable as between private parties. (See Ormet Corp. v. Ohio Power Co. (4th Cir. 1996) 98 F.3d 799, 802 [“The transferability of allowances having durable economic value is . . . expected to create incentives for aggressive and innovative efforts to control pollution”]; see also Cabo Distributing Co., Inc. v. Brady (N.D.Cal. 1992) 821 F.Supp. 601, 609-610 [holder of COLAs entitled to procedural due process protections]; Elk Hills Power, LLC v. Board of Equalization (2013) 57 Cal.4th 593, 609, fn. 7 [160 Cal.Rptr.3d 387, 304 P.3d 1052] [“Even if [by statute] ERCs are not property, an assessor may properly consider their presence when valuing” a power plant; there, the statute gave emission reduction credit holders “exclusive right to use them” (§40710)]; Ferguson v. Ferguson (Alaska 1996) 928 P.2d 597, 599, 600 [although regulations provided fishing quota allocations “ ‘do not convey property rights,’ ” they were an asset subject to marital property division, because the holder could transfer them]; Getting & Streck, Emissions Trading, etc. (2005) 35 Envt. L.Rep. 10219, 10223 [“between the contracting parties, it seems that all normal property rights ... are available. . . . Utilities and all other allowance holders can exclude all others, besides the government, from interfering with their possession, use, and disposition of allowances” (italics added & fns. omitted)].)
Thus, the regulations declaring that the allowances confer no property rights preclude an allowance holder from asserting a takings claim against the State, but the free alienability of the allowances means they are of value to the holder. Indeed, that is the whole point of the “trade” part of the cap-and-trade system, the free alienability of the allowances as between private parties. (See Jopson, supra, 108 Cal.App.4th at p. 494.) That makes them property for due process purposes, because “[t]he right to exclude others, and to sell, assign or otherwise transfer ownership are traditional hallmarks of property.” (Bronco Wine, supra, 129 Cal.App.4th at p. 1030; cf. Conti v. U.S. (Fed.Cir. 2002) 291 F.3d 1334, 1340-1341 [where holder could not transfer fishing permit, no property interest found].) It is difficult to see why any entity would be willing to trade in allowances in the first instance, if the allowances did not constitute property of any kind.
As discussed by the parties in their supplemental briefing, this point was addressed during the rulemaking process. The Board’s initial statement of reasons states in part that “property rights cannot attach to the compliance instruments because, in the event of federal preemption in the cap-and-trade market or other conditions, California must have the ability to revoke the compliance instruments without creating a loss to the people of California.” (Italics added.) The Board’s final statement of reasons confirmed the need for the ability to revoke compliance instruments to protect the state.
*649 But as just explained, this does not mean compliance instruments, including emissions allowances, lack value to the holders. As the trial court found, emissions allowances consist of valuable, tradable, private property rights.
5. The Auction Scheme Does Not Create a Tax Subject to Proposition 13
As we have described, no covered entity is forced to buy emissions allowances, and such allowances are things of value to the owner. These two aspects of the auction system are alien to any reasonable conception of a “tax,” as that term has been used at common law and through Sinclair Paint and beyond. As we have explained, the twin hallmarks of a tax are that it is compulsory, and that it conveys nothing of particular value to the payor. The auction system meets neither of these conditions, and therefore it is not a tax.
The parties offer hypotheticals which we find unpersuasive. Many Californians are compelled to pay income taxes, but despite this compulsion receive no particular thing of value. Similarly, a person may choose to buy a pencil, knowing sales tax will be added to the price, but the buyer receives nothing of particular value for the tax. Neither of these scenarios is akin to buying an emissions allowance, whereby a party chooses to purchase a valuable right to pollute. (Cf. Cooley, supra, Taxes, Their Nature & Kinds, pp. 1-3; 9 Witkin Summary of Cal. Law, supra, Taxation, § 1, p, 25.)
Morning Star argues the payments are not voluntary because they merely allow it to do what it is already doing. That argument might have relevance if Morning Star had a vested legal right to continue polluting. As we have discussed ante, it does not. (See Communities, supra, 48 Cal.4th at p. 324 [“the boiler permits give ConocoPhillips no vested right to pollute the air at any particular level”]; Mobil Oil, supra, 59 Cal.App.3d at p. 305.) Thus, it is not accurate to liken the auction system to payment for the privilege to stay in business in California. It is a payment for the privilege to pollute the air in California.
Some plaintiffs posit that if we find the auction regulations are not a tax, the Legislature could construct similar ways to extract money from Californians and evade Proposition 13 (and perhaps other initiatives). For example, they hypothesize the state could create a cap-and-trade program for vehicle mileage: Each registered vehicle would be given a periodic allowance, and would have to obtain additional allowances to exceed the base allotment. This would reduce road decay and reduce GHG emissions. NAM, echoed by CalChamber, states: “No one would doubt that such a scheme would impose a tax on driving.” Putting aside Proposition 26, which is not implicated by this case, we do doubt it. After all, the state could instead enact a command- and-control rationing system for drivers, but the hypothetical provides a *650 bypass for those drivers who choose to exceed their base allotment. Such a scheme would not be a “mileage” tax, as plaintiffs suggest.[30] Instead, the market would set the price, and drivers could choose how to exercise and modify their driving behavior. In any event, we can confront such hypothetical situations if and when they arise; we do not offer any advisory opinions at present.
In short, because the Board’s cap-and-trade regulations do not compel anybody to buy emissions allowances, and confer on voluntary buyers a valuable commodity, they do not create a “tax” as that term is generally understood. The auction sales program does not violate Proposition 13.
6. Use of the Auction Revenue
Plaintiffs and allied amici curiae contend that under various statutes the money—raised by “an unelected, politically-appointed state board”—is being used to support diverse programs that would otherwise be paid for from general fund sources. Their point is the Legislature has effectively adopted a cash cow sired by the Board and is milking it for a purportedly endless number of programs that have at best a tenuous connection to the discharge of GHGs by covered entities. At oral argument this was referred to pejoratively as a “slush fund.”
We conclude this issue is not ripe, but we address it briefly to explain why it is important to decouple the issues of generation of revenue from the expenditure thereof, when evaluating whether a payment to the government equates to a tax.
In the trial court, Morning Star argued—without contradiction—that a bill “requires [a] set aside [of] 25% of [auction revenues] to projects benefitting disadvantaged communities, and at least 10% of that fund must go toward projects actually located in such communities. . . . Although it may be a good thing to benefit disadvantaged communities . . . there is little if any relationship that has been established between reducing greenhouse gas emissions and benefitting disadvantaged communities.” Plaintiffs also reference certain 2014 legislation allocating revenues to a wide variety of programs. We granted Morning Star’s request for judicial notice of these bills, ante.
*651 We have reviewed the three petitions in this case, and none seeks to invalidate any of the Legislature’s decisions about how to spend the auction proceeds; instead, their joint object is to invalidate the auction sales, although some parts of some petitions mention some uses of auction proceeds. But the legality of any particular expenditure was not attacked in the trial court, and no plaintiff seeks to abrogate any specific expenditure in their briefing or supplemental briefing.
If the Legislature appropriated auction proceeds in a manner violating the current statute governing such revenues (Gov. Code, § 16428.8), no doubt a suit could be filed to restrain such misuse of revenue by analogy to the “special fund” cases. (See City of Azusa v. Cohen (2015) 238 Cal.App.4th 619, 628 [190 Cal.Rptr.3d 186]; Veterans of Foreign Wars v. State of California (1974) 36 Cal.App.3d 688, 692-696 [111 Cal.Rptr. 750] (Veterans); see also Edgemont Community Service Dist. v. City of Moreno Valley (1995) 36 Cal.App.4th 1157, 1163-1166 [42 Cal.Rptr.2d 823].) But the mere possibility that the Legislature may err at times in making an expenditure of allotted revenue does not speak to the legality of the collection of that revenue. Although, broadly speaking, the analysis of how a collected amount is spent may be relevant to the “fee versus tax” determination applied in Sinclair Paint, which we have discussed ante, it does not inform our analysis here. For reasons we have explained, we are not presented with a program triggering the Sinclair Paint analysis.[31]
To the extent the proceeds’ expenditure may seem inappropriate to some, those who seek to challenge it may do so. As demonstrated by the special fund cases, Californians have shown little hesitation in challenging alleged improper diversions by the Legislature. And the remedy in such cases is generally restoration of the money to its proper purpose, and preclusion of future unlawful diversions, not return of money to the payors. (See, e.g., Veterans, supra, 36 Cal.App.3d at p. 696-697; Shaw, supra, 175 Cal.App.4th at pp. 600-615 [invalidating legislative transfers of certain funds].) Therefore, we do not see how any hypothetical misappropriation of funds here would either nullify the program or transform the auction revenues into a tax.
More broadly, whether any program will advance the Act’s goals is a legislative question in the first instance. (See Collier v. City and County of San Francisco (2007) 151 Cal.App.4th 1326, 1340 [60 Cal.Rptr.3d 698]; Scientists, supra, 79 Cal.App.4th at p. 950.) Courts presume legislation is valid and legislative findings are supported by evidence, in deference to the *652 separation of powers of state government (see Cal. Const., art. Ill, § 3), and a challenger cannot simply go to court with contrary facts and launch a battle of experts to try to show the Legislature made a poor decision about how well a given program effectuates legislative purposes. (See Schabarum v. California Legislature (1998) 60 Cal.App.4th 1205, 1217-1221 [70 Cal.Rptr.2d 745] [attack on budget expenditure does not permit second-guessing of legislative factfinding; but neither does the judiciary rubber stamp acts the invalidity of which plainly appear].) A legal avenue may be open to challenging a specific use of auction proceeds on the ground the expenditure is insufficiently related to the statutory purpose, but this case does not make such a challenge. Thus we have no occasion to prescribe the legal standards such an action must meet to succeed. It is enough to say that the possibility that an erroneous diversion might occur does not bolster the claim that the auction system creates an unlawful tax.
DISPOSITION
The judgments are affirmed. In each case appellants shall pay the appellate costs of respondents. (See Cal. Rules of Court, rule 8.278.)
Butz, J., concurred.

 Further undesignated statutory references are to the Health and Safety Code.

 Although regulations state that the allowances confer no property rights (Cal. Code Regs., tit. 17, §§ 95802, subd. (a)(299), 95820, subd. (c)), the trial court correctly found they are valuable commodities, a point we explain below (see pt. IIC.4., post).

 We grant all pending requests for judicial notice, except as to items A and B of the Board’s supplemental request, jointly opposed by plaintiffs, as those items consist of federal documents neither presented to the trial court (see Brosterhous v. State Bar (1995) 12 Cal.4th 315, 325-326 [48 Cal.Rptr.2d 87, 906 P.2d 1242]) nor considered by the Board during the rulemaking process; nor are they properly responsive to our supplemental briefing order.

 Intervener National Association of Manufacturers (NAM) correctly points out that a Board regulation cannot restrain the Legislature, nor can one Legislature bind the hands of a future one (see In re Collie (1952) 38 Cal.2d 396, 398 [240 P.2d 275]), therefore another Legislature might attempt to change current limits on the use of auction proceeds.

 See Statutes 2012, chapter 39, section 25; Statutes 2012, chapter 807; Statutes 2012, chapter 830; and Statutes 2012, chapter 21, section 15.11 (California’s Budget Act of 2012). Contrary to Morning Star Packing Company’s repeated assertions, under the Budget Act of 2012, the $500 million diversion could not be used for general revenue purposes, but instead was made “available to support the regulatory purposes of’ the Act. (See Stats. 2012, ch. 21, § 15.11.)

 The other parties to Morning Star’s petition are Dalton Trucking, Inc.; California Construction Trucking Association; Merit Oil Company; Ron Cinquini Farming; Construction Industry Air Quality Coalition; Robinson Enterprises, Inc.; Loggers Association of Northern California, Inc.; Norman R. “Skip” Brown; Joanne Browne; Robert McClernon; and the National Tax Limitation Committee.

 We have received substantial amicus curiae briefing as follows: (1) The California Taxpayers Association; (2) the California Manufacturers and Technology Association (CMTA); and (3) the National Federation of Independent Business Small Business Legal Center, Owner-Operated Independent Drivers Association, Inc., and Associated California Loggers (NFIB), on behalf of plaintiffs; and (4) Dr. Dallas Burtraw and 16 other economics and public policy scholars, assisted by students from the University of California, Berkeley School of Law Environmental Law Practice Project (Burtraw); and (5) The Nature Conservancy, assisted, inter alia, by students from the UCLA School of Law Frank G. Wells Environmental Law Clinic, on behalf of the Board and EDF. In response to a supplemental briefing order, we *619 received an amicus curiae brief by the International Emissions Trading Association (IETA), in part representing offset credit developers and major power producers including Pacific Gas & Electric Co., the Sacramento Municipal Utility District, and Southern California Edison Co.; IETA’s brief supports the Board’s regulations as against the Proposition 13 challenge.

 The fact the Legislative Analyst opined that an allowance auction was not necessary to meet the Act’s goal is not dispositive. It is the Board’s opinion that counts, and even if an auction were not strictly necessary, the Board could find it was more effective and therefore reasonably necessary, a finding well within its legal purview.

 The Board followed eight other commands in crafting regulations, including to “minimize leakage” (§ 38562, subd. (b)(8)), which is a reduction of in-state emissions “offset by an increase . . . outside the state.” (§ 38505, subd. (j).) Leakage includes businesses choosing to leave California rather than comply with the regulations. The regulations classify industrial sectors by risk of leakage, and adjust the amount of free allowances accordingly. (See Cal. Code Regs., tit. 17, § 958700

 Although we have granted CalChamber’s unopposed request for judicial notice, tendering dictionary definitions of “distribution,” we find no serious ambiguity in the term as used herein. (Cf. Miller Brewing Co. v. Department of Alcoholic Beverage Control (1988) 204 Cal.App.3d 5, 12-15 [250 Cal.Rptr. 845] [finding ambiguity in “distribution” as used in the context of liquor marketing, and giving it the broadest meaning]; California Mfrs. Assn. v. Public Utilities Com. (1979) 24 Cal.3d 836, 843-848 [157 Cal.Rptr. 676, 598 P.2d 836] [similar holding].) We need not address whether distribution of allowances has a technical meaning as discussed in the briefs.

 The Board was concerned windfalls could pass to entities contrary to the public good, as had happened “during the first phase of the European Union Emissions Trading Scheme. . . . Researchers emphasize that windfalls occurred because facilities were awarded free allowances and yet still passed opportunity costs through to consumers.” Amici curiae Burtraw and The Nature Conservancy emphasize and elaborate on these economic fairness concerns.

 It is true, as CalChamber points out, that the Environmental Protection Agency guide also states existing programs allocated free allowances. That does not change the fact that the Legislature knew a choice would have to be made about whether or not to auction allowances, if the Board decided to adopt a cap-and-trade program.

 NAM and CalChamber argue such a broad delegation—if intended—would be unlawful, but fail to provide coherent analysis or separately head the point, which therefore is forfeited. (See In re S.C. (2006) 138 Cal.App.4th 396, 408 [41 Cal.Rptr.3d 453].) Moreover, there was no abdication of legislative power, because the Act sets the boundaries of the Board’s discretion, and the policy goals. (See Hess Collection Winery v. Agricultural Labor Relations Bd. (2006) 140 Cal.App.4th 1584, 1604-1605 [45 Cal.Rptr.3d 609].)
We note that taxes must be levied by the legislative, not executive, branch. (See Hilliard, Law of Taxation (1875) § 1, p. 1; 1 Cooley, A Treatise on the Law of Taxation (3d ed. 1903) the Nature of the Power to Tax, p. 43 (Cooley).) Nor can the legislature delegate the power to tax to an administrative board, although a board can value property and collect taxes. (See 71 Am.Jur.2d (2001) State and Local Taxation, § 107, pp. 393-394.) Here, because we find no tax (see pt. II, post), we need not consider whether, if the revenue generated by the auction sales were a tax, it could have been created by the Board and then ratified by the Legislature. (See pt. IC.L, post.)

 We have acknowledged that floor statements provide cognizable legislative history of a bill. (Kaufman & Broad Communities, Inc. v. Performance Plastering. Inc. (2005) 133 Cal.App.4th 26, 31-32 [34 Cal.Rptr.3d 520] (Kaufman).)

 The Legislative Analyst’s opinion, in part, was that a “cap-and-trade program differs from a carbon tax in that the cost of emitting each ton of CO2e is not decided by the regulator. Rather, the cost is determined, in effect, by the emissions sources themselves through trading of emissions allowances.” (Legis. Analyst, Evaluating the Policy Trade-offs in ARB’s Cap-and-trade Program (Feb. 9, 2012) p. 6.)

 In addition to the proposed signing statement, the enrolled bill report also includes three different draft veto messages. Their' inclusion shows that not all documents found in such *629 reports are relevant or persuasive indications of legislative intent. (See Jones, supra, 2 Cal.5th at pp. 395-396; Kaufman, supra, 133 Cal.App.4th at pp. 40-42.)

 According to a Legislative Analyst report in the record, “Traditionally, California has relied upon direct regulatory measures to achieve emissions reductions and meet other environmental goals. Such regulations, commonly referred to as command-and-control measures, typically require specific actions on the part of emissions sources to achieve the desired emissions reductions or other goals. ... In contrast, market-based mechanisms provide economic incentives to achieve emissions reductions, without specifying how emissions sources are to achieve those reductions.” (Legis. Analyst, Evaluating the Policy Trade-offs in ARB’s Cap-and-trade Program, supra, p. 5.) Either way, the Legislature could have specified how the proceeds would be used if the Board adopted a cap-and-trade program. But it could also conclude such a specification might tilt the scale in favor of such a program, rather than ensuring the Board—the agency with expertise in the subject matter—had maximum flexibility, within legislative parameters.

 We note that the trial court found “a Senate Committee report on [Senate Bill No.] 31 reflects an understanding that [Assembly Bill No.] 32 already authorized auctions.”

 Contrary to the Board’s evident view, the constitutional doubt canon is distinct from the constitutional avoidance doctrine, whereby it is often deemed prudent to address a statutory or other ground to avoid reaching a constitutional ground. (See, e.g.. People v. McKay (2002) 27 Cal.4th 601, 608, fn. 3 [117 Cal.Rptr.2d 236, 41 P.3d 59].)

 Also contrary to CalChamber’s apparent view, nothing in Shaw v. People ex rel. Chiang (2009) 175 Cal.App.4th 577 [96 Cal.Rptr.3d 379] (Shaw) addresses ratification. Rather, the case involved legislative violation of spending strictures, an issue we address in part IIC.6., post.

 We were not asked to decide whether an administrative or legislative attempt to extend the cap-and-trade rules promulgated under the Act beyond 2020 would be subject to Proposition 26’s terms, and do not purport to do so.

 In contrast, as mentioned earlier. Proposition 26 “shifted to the state or local government the burden of demonstrating that any charge, levy or assessment is not a tax.” (Schmeer. supra. 213 Cal.App.4th at p. 13224

 This provision was amended by Proposition 26, as discussed in part IC.2., ante.

 Plaintiffs emphasize this last finding, arguing that it is possible to connect any human activity to GHG emissions, meaning there is no definable regulatory horizon. Our dissenting colleague appears to accept this view.

 A point pressed by the Board and EDF, in defense of the trial court’s ruling, is that the Board had no puipose to generate revenue, and therefore any auction revenue is merely a “byproduct” of the regulations. They point out that Proposition 13 restricted changes “for the purpose of increasing revenues” (Cal. Const., art. XIII A, former §3) and contend revenue generation was not the purpose of the auction system. But the Board concedes it knew the auctions would generate revenue, and it adopted the regulations with such knowledge, therefore it intended to generate revenue, whether or not that was its prime motivation. (See People v. Colantuono (1994) 7 Cal.4th 206, 217-218 [26 Cal.Rptr.2d 908, 865 P.2d 704] [oblique intention; where the actor knows likely consequence, is not explicitly motivated to *639 achieve it, yet still acts, the actor intends the consequence]; City of Madera v. Black (1919) 181 Cal. 306, 314 [184 P. 397] [“Persons, even when acting officially, are presumed to intend the necessary consequences of their acts”]; Evid. Code, § 665.) Therefore, as plaintiffs maintain, we cannot characterize billions of dollars of anticipated auction revenues as a fortuitous byproduct of the regulations.

 The fact a declaration appears in the record and was not directly contravened does not necessarily establish the truth of its contents. A trial court is free to disbelieve evidence whether or not contradicted, if there is a rational basis for doing so. (See Foreman & Clark Corp. v. Fallon (1971) 3 Cal.3d 875, 890 [92 Cal.Rptr. 162, 479 P.2d 362]; Hicks v. Reis (1943) 21 Cal.2d 654, 659-660 [134 P.2d 788].) For example, the Rabo declaration in large part hinged on the claimed lack of awareness of feasible alternative technologies, but does not set forth what steps Morning Star took to educate itself. Nor did Morning Star include declarations from engineers or scientists that support its economist’s view that no feasible alternatives to currently used emissions control methods exist. But even if the Rabo declaration were wholly complete and unassailable, it would make no difference to the analysis of the legal question before us, as we explain post in this section.
After oral argument in this case, our Supreme Court granted review in an unrelated case, raising the following two issues: “(1) Can a statute be challenged on the ground that compliance with it is allegedly impossible? (2) If so, how is the trial court to make that determination?” (National Shooting Sports Foundation, Inc. v. State of California (2016) 6 Cal.App.5th 298 [210 Cal.Rptr.3d 867], review granted Mar. 22, 2017, S239397.) Those issues arguably speak to Morning Star’s act of submitting the Rabo declaration—material outside the normal administrative record—to the trial court. However, we express no view on the procedural propriety of such action herein.

 Morning Star argues “for those who choose to remain in California, the state income tax does not somehow become ‘voluntary’ and not a tax. Merely because a company like Morning Star chooses to continue to do business in the state by purchasing allowances at auction does not make the auction payments any more ‘voluntary’ or any less of a tax.” This argument is unpersuasive, because Morning Star need not leave the state to avoid buying auction credits. Instead, like any other covered entity, it can modify its polluting behavior or obtain offset credits. Both of these options, admittedly, may be costly, but not necessarily any more so than if the Board had imposed a command-and-control cap on emissions. This seems to be another iteration of a point we reject. The fact that the auction system may result in costs does not make the auction system a tax.

 Under the Act, the Board was to consider “direct emission reduction measures.” (§ 38561, subd. (b).) This is another term for command-and-control measures.

 Contrary to the dissent’s view, we do indeed “recognize that this litigation is not between private parties, but between plaintiffs and the state.” (Dis. opn., post, at p. 660.) Our point is that private parlies (such as Morning Star) are holding a thing of value once they acquire the auction credits, regardless of how and from whom the credits were acquired.

 Whether such a system would be deemed an impermissible burden on intrastate travel presents an entirely different question not relevant to this discussion, and not before us. (But see Tobe v. City of Santa Ana (1995) 9 Cal.4th 1069, 1100-1101 [40 Cal.Rptr.2d 402, 892 P.2d 1145]; Allen v. City of Sacramento (2015) 234 Cal.App.4th 41, 60 [183 Cal.Rptr.3d 654] [“Otherwise lawful ordinances that have an indirect or incidental impact on the right to travel and do not discriminate among classes of persons by penalizing the exercise of the right to travel are not constitutionally impermissible”].)

 We do not disregard plaintiffs’ arguments regarding the propriety of the expenditures merely because plaintiffs have not specifically challenged those expenditures, as our dissenting colleague suggests. (Dis. opn., post, at pp. 661-662, 669.) Simply put, the expenditures are not relevant here.