Filed 12/23/22  P. v. Esquivel CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sutter)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>VICTOR HUGO VIVANCO ESQUIVEL,<br><br>Defendant and Appellant. | C094455<br><br>(Super. Ct. No. CRF19-3080) |

After a fight involving defendant and the victim (E.G.) earlier that evening, defendant chased and shot E.G. as the two ran through a restaurant.  Defendant claimed he was acting in self-defense and that he perceived E.G. posed an increased danger to him and his family in part because he believed E.G. was affiliated with a gang.

Defendant presented evidence E.G. pointed a gun at him during the earlier fight and threatened to kill him moments before defendant shot E.G.  He also presented evidence he heard a noise he thought was a gunshot seconds before he shot E.G.  The trial court prohibited defendant from presenting his belief that E.G. was affiliated with a

1

gang and the additional evidence that formed a basis for that belief. A jury convicted defendant of premeditated attempted murder and assault with a semiautomatic firearm.

On appeal, defendant argues the trial court's evidentiary ruling was prejudicial error, as it "went to the very heart of the defense and hamstrung [his] ability to show that he acted in, at least, imperfect self-defense." We agree that the trial court abused its discretion in excluding this supporting evidence for defendant's claim of imperfect self-defense. Because we see a reasonable probability of an outcome more favorable to defendant absent this error, we reverse the judgment.

## I. BACKGROUND

### A. Trial Court's Evidentiary Rulings

#### 1. Pretrial Ruling

While hearing the prosecution's pre-trial motion in limine that defendant be prohibited from referring to gangs, gang membership, or gang signs, the trial court and defense counsel had the following colloquy.

Trial court: "Is it your argument, [defense counsel], that the defendant believed he was in imminent danger because he believed he saw some motions that were gang-related? That would make him believe the alleged victim was dangerous because he was a gang member, is that—

"[Defense counsel]: In part, yes.

"Trial court: What else?

"[Defense counsel]: In terms of just—

"Trial court: The gang references?

"[Defense counsel]: The statements that [E.G.] made, the gestures, the way he was dressed.

"Trial court: Right. But what is the relevance of those?

"[Defense counsel]: That's to explain the fear that he had, his belief at the time.

2

"Trial court: Now, in order for him to have had that belief, he would have to have some knowledge of gangs.

"[Defense counsel]: . . . [h]e has seen people that are gang members flashing signs and he just gets away. [¶] One time he was at the Sutter County Fair and gang members doing those signs . . . beat several individuals up. . . . He saw that with his own eyes and that caused him fear and he left.

"Trial court: This . . . issue is – it's highly prejudicial if there's gang reference and it goes to the jury. [¶] What I want right now, I don't want any gang reference in any opening statement."

Later, the trial court amplified: "And no reference to throwing signs, even if you don't use the word gang. . . . So that is something that we're going to have to have a[n Evidence Code section] 402 hearing about later."[1]

### 2. Ruling After Section 402 Hearing

In a hearing that occurred out of the jury's presence and after the People's case-in-chief, defendant testified he believed E.G. was a gang member because: (1) "He raised his arms up in the air and moved his fingers"[2]; (2) "The way he was dressed" (E.G. "was wearing baggy pants, his pants were low, he was wearing a sweatshirt and he was wearing a hat . . . [that] said 'Cali' on it"); and (3) "the things that he was saying"—"for me to get out of his barrrio" and "they were going to kill me."

Defendant explained that, previous to his interaction with E.G., he was at a county fair where "some people . . . were moving their arms around and as three people were passing by, they also responded with signs. A fight ensued and then more people from

---

[1] Undesignated statutory references are to the Evidence Code.

[2] Defense counsel explained, "what [defendant] did, that he raised – he's doing it right now. He raised his arms and then he's moving his fingers on both hands."

3

one side got involved."[3]  Defendant heard people at the fair talking later about the fighters being gang members.

Those gang members who fought at the county fair "were moving their fingers" in a "similar" way to the way E.G. moved his fingers on November 8, 2019.  "They weren't doing the same exact thing[,] but it was similar."

Defendant had no other knowledge about gang members.

The trial court ruled:  "I just want to make the record clear, everything I've heard is mere speculation on the defendant's part.  [¶]  He also indicated—even if we're looking at—I believe even if it was unreasonable, and it would be of slight relevance given that he indicated the movements were similar, not the same, but similar in moving the fingers.  I didn't hear anything about how he knew that gang members dressed this way.  He's not in a gang.  It's purely speculative.  And it's highly prejudicial.  Very low relevance.

"We have the phrase, Get out of my barrio, Get out of this barrio, and they are going to kill him.  Those are relevant.  Those can come in.

"The additional belief that's because they were gang members is speculative and of low relevance and highly prejudicial."

Defense counsel responded:  "I just want to put on the record, I would think this is all relevant and pertinent to [defendant's] state of mind and to his beliefs under [CALCRIM No.] 3470, the right to self-defense and defense of others."

Later, after the prosecutor stated his position on the matter, the trial court explained to defense counsel how *not* to question defendant regarding E.G.'s hand movements:  "So questions as to show us what he was doing and you don't refer to them as signs or throwing signs or anything to that effect, is fine."

---

[3] Defense counsel explained, defendant "w[as] raising [his] hands again up in the air and moving [his] fingers."

The trial court reiterated the basis of its evidentiary ruling to defense counsel: "I don't disagree with you, it has a slight relevance. It's that it's substantially outweighed by the risk of prejudice because we have the words that were said and we have the motions, so the additional relevance of his belief that because there was—there were also hand gestures thrown . . . years prior to that were not the same but might have been similar is of low probative value."

B. *Prosecution's Case*

1. *Restaurant Employee*

Around 7:00 p.m. on November 8, 2019, a Yuba City restaurant employee arrived at work and saw a crying woman with a baby in a portable car seat. Later, defendant arrived and parked his car in front of the restaurant's front door.

While defendant and the woman with the baby had a heated argument inside the restaurant, E.G. arrived to pick up a to-go order. Defendant was holding the woman's arm, pulling her outside. Standing about three feet away, E.G. said to defendant (in Spanish), " 'Are you going to start with your shit here?' "

Defendant pulled out a gun and pointed it at E.G., who was not holding any weapons and had not raised his hands into the air. E.G. ran away, and the employee heard three gunshots. She did not hear any other gunshots before defendant tried to fire his gun.

2. *Restaurant Employee's Husband*

The restaurant employee's husband arrived at the restaurant that evening shortly after the employee. He walked by defendant, who was sitting in a car in front of the restaurant. There were four other non-employees in the restaurant: a woman with her baby, and a couple eating at a table.

The employee's husband saw E.G. come into the restaurant and get in line.

Defendant opened the front door of the restaurant and, in Spanish, yelled and cursed at the woman with the baby to get in his car. E.G. asked defendant, in Spanish, "if

5

[he was] going to start . . . again." E.G. used a curse word and was not being polite, but he was not acting angrily or making any sort of taunting gestures towards defendant. E.G. was not holding a knife or gun.

Defendant left. He returned six seconds later, swung open the restaurant door, walked up to E.G., and pointed a gun at his head. Defendant pulled the trigger twice, and the gun went "click, click" but did not fire, giving E.G. a chance to run away. Defendant chased E.G., still pointing the gun at him, and the restaurant employee's husband heard a bang. That was the first bang he heard.

The employee's husband eventually ran towards the sound of the bang and saw defendant pointing the gun at and "standing over [E.G.]" who was on the floor. Defendant tried to fire the gun, but it did not fire; it just made the "click, click" sound again.

### 3. *The Couple Eating*

A male customer and female customer got to the restaurant around 8:00 p.m. that evening and were eating at a table. A woman with her baby was there, and she was crying. E.G. came in and was standing near the employee's husband.

The male customer "saw some hand gesturing." E.G. was making a "motion" with his hands "encouraging somebody to come in." E.G. had no weapons in his hands, and did not appear to be angry, but he did appear to be taunting or antagonizing someone outside.

The male customer heard a noise—perhaps a gunshot ("[t]here is a shooting range over there"), "a car door slamming," or maybe "something else"—and screaming, and then saw defendant come inside the restaurant holding a gun. Defendant pointed the gun towards E.G. and the employee's husband and appeared to try to shoot. The gun didn't fire, and E.G. ran away. Defendant gave chase, pulling and hitting the gun. The male customer then heard the gun fire.

6

The female customer recalled arriving at the restaurant for dinner and finding a woman with a baby in a car seat carrier. Later, the employee's husband and E.G. walked in the restaurant.

Seconds later, the female customer heard yelling and screaming. She saw E.G. saying something towards someone outside, putting his hands up and "[p]ulling his hands towards his chest." He was not holding any weapons.

Then she heard females screaming and "a big bang." She "thought it was a gunshot," but it could have been the noise of a car door slamming. Then E.G. and defendant (holding a gun) ran by her. Defendant shot at E.G. as they were both running. The sound of defendant's gun was louder but not necessarily "different" than the sound she heard moments earlier.

C.     *Defendant's Case*

Defendant testified at trial. He told the jury that around 6:00 p.m. on November 8, 2019, he arrived home to his girlfriend and nine-month-old baby in Yuba City. He worked a construction job in Santa Rosa that day, having slept in his car in Santa Rosa the night before. Defendant kept a gun in his car for protection because he sometimes stayed overnight at job sites.

Defendant drove his girlfriend to her friend's home. After they arrived two men suddenly came out of the house, and both of them started hitting defendant. Defendant's girlfriend ran away with their son; defendant did not see where they went.

E.G. was one of the two men who attacked defendant. E.G. pointed a gun at him as the second man hit defendant with a "2 by 4" "pole" "used in fencing."

Defendant retreated and called 9-1-1 with his cell phone. E.G. went back inside the house but the second man remained outside, standing by defendant's car. The 9-1-1 operator asked for defendant's location, and told him to wait on the line while they tried to connect him to somebody who spoke Spanish.

7

Defendant ended the call after waiting on the line for a while without any response. After waiting 10 minutes, defendant tried to get to his car to leave, but the same two men started hitting and kicking defendant again. Defendant fell, and the men continued hitting and kicking him.

Defendant eventually got away, and E.G. followed him. At one point, E.G. "was wiggling his fingers" at defendant.[4]

Defendant made it back to his car and drove away, looking for his girlfriend and their baby. Defendant's girlfriend called him and told him she was at the restaurant and their son needed diapers. Defendant drove to the restaurant, gave his girlfriend diapers, and asked her to leave with him. She told him to wait for her to change the baby's diaper.

As defendant waited in his car by the entrance of the restaurant, he saw E.G. approaching, "yelling," "wanting to fight," and "doing this with his hands." He told defendant "it was his barrio and that [defendant] should leave. If [defendant] didn't, [E.G.] was going to finish [him] off." Defendant told E.G. to leave him alone, raised the car window so there was only a two-inch opening, locked the door, and tried to avoid eye contact with E.G.

E.G. walked inside the restaurant (where defendant's girlfriend and son were) and continued "behaving aggressively inside" putting his hands in the air, and "doing like this," defendant testified (apparently imitating E.G.'s hand movements). Defendant turned away, because he "didn't want to have any problems." One or two seconds later, he heard a gunshot come from inside the restaurant.

Defendant feared his family was in danger because they were inside. He looked at E.G., who was staring back at him. Defendant grabbed the gun inside his car with one

---

[4] Defendant testified E.G. was "wiggling his fingers making like signs," but the trial court later struck the "signs" portion of that testimony.

hand and grabbed the magazine to the gun with the other hand and ran inside the restaurant.

E.G. ran and defendant chased him because he had heard a shot, and "wasn't sure if [E.G.] had a gun." Defendant feared E.G. was holding a gun in his right hand, which defendant could not see as E.G. ran away.

As defendant chased E.G., he tried to insert the magazine into the gun. While doing so, the gun discharged accidentally. The bullet did not hit E.G., but E.G. started turning to his left towards defendant, his right hand (which defendant could not see) down by his side. "And that's when [E.G.] tried to turn around and that's when I fired," defendant testified. "I was afraid that he was going to shoot me, shoot my family, my son's mother."

Defendant went back to the front of the restaurant to look for his girlfriend and baby. Not finding them, he drove away in his car, afraid E.G.'s friends "would do something" to him.

D.      *Prosecution's Rebuttal Witness*

E.G.'s companion, T.C., who fought with defendant outside the house before the restaurant incident testified that he lived at the house with E.G. and several others. Around 6:30 or 7:00 p.m. on November 8, 2019, T.C. heard a "real loud scream," and went to see what was going on. He saw his friend (defendant's girlfriend) arguing with defendant.

T.C. grabbed a "fence post" off the ground, defendant "came towards" him, and he swung the fence post and hit defendant on the shoulder. E.G. came out of the house and joined T.C. in the middle of the street. E.G. did not have a gun.

Defendant and E.G. spoke to each other in Spanish, a language T.C. did not speak. Defendant "bolted" at E.G., who kicked defendant in the groin.

No one struck defendant again. He and E.G. walked toward defendant while he "backed off" and made a call on a cell phone.

9

*E.     Jury Instructions*

Instructing the jury with CALCRIM No. 604, the trial court explained: "If you conclude[ ] the defendant acted in complete self-defense or defense of another, his action was lawful and you must find him not guilty of any crime."  By contrast, the trial court explained, an attempted killing that would otherwise be attempted murder is reduced to attempted voluntary manslaughter if the defendant attempted to kill a person because he acted in *imperfect self-defense* of or defense of another.  "The difference between complete self-defense or defense of another and imperfect self-defense or defense of another depends on whether the defendant's belief in the need to use deadly force was reasonable."

The trial court further instructed the jury defendant acted in *imperfect* self-defense or defense of another if: (1) defendant took at least one direct but ineffective step toward killing a person; (2) defendant intended to kill when he acted; (3) defendant believed he or someone else was in imminent danger of being killed or suffering great bodily injury; and (4) defendant believed the immediate use of deadly force was necessary to defend against the danger, and at least one of those beliefs was unreasonable.

"[D]efendant must have actually believed there was imminent danger of death or great bodily injury to himself or someone else," the trial court explained.  "In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant.  [¶]  If you find that [E.G.] threatened or harmed the defendant in the past, you may consider that information in evaluating the defendant's beliefs."

The trial court also explained to the jury it was the prosecution's burden to prove beyond a reasonable doubt defendant did not act in self-defense or imperfect self-defense.

*F.      Closing Arguments*

*1.      Prosecution Closing*

"The facts of the case are straightforward when you boil it down to what happened on November 8th, 2019," the prosecutor told the jury. "There is no big issue of self-defense. This was simply an attempted murder."

E.G. came to the restaurant to "pick[ ] up a food order." "He . . . observes the girl with the baby, the defendant's girlfriend, crying, being emotional. [¶] Defendant also comes in and out of the restaurant. . . . He was trying to drag her out and it appeared she did not like that. [¶] That's when [E.G.] intervenes. He uses some words, something to the effect of, You're going to start some shit. . . . [¶] And apparently . . . defendant did not like that. He did not appreciate those words because that's when the defendant grabs the gun. He arms himself, apparently because [E.G.] put his arms up and wiggled his fingers, which would suggest that he was not holding a gun. He was not holding any weapons."

"[T]here's no way for you to find that [defendant's] belief" that he or someone else was in imminent danger of suffering bodily injury "was honest or sincere," the prosecutor argued. "[E.G.] had no weapons. Even if . . . [E.G.] beat [defendant] up earlier that night [,] . . . [t]hat was way before the incident in [the restaurant]." "The only thing that [E.G.] did was insult the defendant . . . and then raising his arms up and wiggling his fingers, not menacing, not requiring the imminent danger or need to use self-defense."

*2.      Defense Closing*

Defense counsel told the jury the prosecutor "glossed over" a crucial fact in his closing argument: the couple eating in the restaurant both heard a sound they thought might have been a gunshot just before defendant entered the restaurant. Counsel argued that—in the context of E.G. (1) assaulting and (2) pointing a gun at defendant earlier that evening, and (3) threatening to kill defendant moments before—defendant reasonably

11

thought he was facing an imminent danger of serious bodily harm to himself or his loved ones when he heard what he too thought was a gunshot.

*G.      Verdicts and Sentence*

In April 2021, the jury found defendant guilty of attempted murder (Pen. Code, §§ 664, 187, subd. (a)—count 1) and assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b)—count 2), and found true certain allegations, including that the attempted murder was premeditated.

In July 2021, the trial court imposed an aggregate sentence of 32 years to life with the possibility of parole.

Defendant appealed.

## II.  DISCUSSION

*A.      Section 352*

Defendant argues the trial court erred by refusing to permit him to testify to his belief E.G. was a gang member.  "Whether [defendant] actually and reasonably believed [E.G.] belonged to a gang was a question for the jury," defendant contends.  And—because of the "common belief [] that gang members are more prone to violence than non-gang members"—defendant argues his belief E.G. was a gang member "added significantly to the reasonableness and authenticity of [his] belief" E.G. posed an imminent threat of bodily injury or death.  Accordingly, defendant maintains, the excluded evidence was critical to his theories of perfect and imperfect self-defense.

The People counter the trial court properly ruled defendant's "unsupported belief . . . [E.G.] was a gang member was unduly prejudicial."  (Emphasis omitted.)

We conclude the trial court abused its discretion under section 352.[5]

_____

[5] Defendant contends the trial court violated his state and federal constitutional rights to "present a complete defense."  In doing so, he discusses section 352 and its principles.  In their briefing, the People also discuss section 352 principles.  Because (1) the parties'

12

*B.     Background Legal Principles*

"The basic rationale of the doctrine" of imperfect self-defense "is that a *genuine* belief in the need to defend oneself, even if unreasonable, negates the 'malice aforethought' which is required for a conviction of [attempted] murder." (*People v. Hayes* (2004) 120 Cal.App.4th 796, 801, italics added.)

Section 352 gives the trial court discretion to "exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (§ 352.)

We review a trial court's evidentiary rulings under the abuse of discretion standard of review. (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 884.) The exercise of discretion influenced by erroneous understanding of applicable law is an abuse of discretion. (See *People v. Superior Court (Humberto S.)* (2008) 43 Cal.4th 737, 755 ["because the trial court's decision . . . rested on an error of law, it was an abuse of discretion"].)

*C.     Analysis*

Here, defendant's theory at trial was he shot E.G. because he feared E.G. was going to shoot him or his loved ones. Thus, the central question for the jury to resolve was what defendant actually and reasonably believed. In support of his defense, defendant presented evidence: (1) E.G. attacked and pointed a gun at him earlier that evening; (2) E.G. threatened to "finish . . . off" defendant moments before the shooting; and (3) defendant heard what he thought was a gunshot moments before he ran into the

_____

briefs include discussion of section 352, and (2) we believe "it is . . . prudent to address a statutory . . . ground to avoid reaching a constitutional ground" (*California Chamber of Commerce v. State Air Resources Bd.* (2017) 10 Cal.App.5th 604, 631, fn. 19), we resolve defendant's claim through the lens of section 352. (See, e.g., *People v. McKay* (2002) 27 Cal.4th 601, 608, fn. 3.)

restaurant to defend himself and his loved ones. Testimony of the couple eating at the restaurant corroborated defendant's evidence on the last point, at least somewhat.

But the trial court prohibited defendant from presenting evidence he believed E.G. was a gang member (and the basis for that belief) because the trial court determined, in part, that belief was "mere speculation."

The trial court's decision rested on an error of law, apparently conflating the speculative nature of defendant's belief with its *genuineness*. In other words, defendant's belief E.G. was a gang member may have been "speculative," but such a characterization is immaterial to the question whether defendant's belief was genuine. Because the trial court's decision rested on an error of law, it was an abuse of discretion. (*People v. Superior Court (Humberto S.), supra*, 43 Cal.4th at p. 755.)

This legal error aside, the trial court also abused its discretion in weighing the relative probative and prejudicial values of the excluded evidence.

Defendant's evidence was not of "low probative value," it was highly probative of defendant's purported motive for shooting E.G.: fear. The excluded evidence would have provided context for the issue of the genuineness of defendant's belief he needed to defend himself, his girlfriend, and his child by shooting E.G. " ' "[B]ecause a motive is ordinarily the incentive for criminal behavior, *its probative value generally exceeds its prejudicial effect*." ' " (*People v. McKinnon* (2011) 52 Cal.4th 610, 655, italics added.) Here, in the context of defendant's case of (imperfect) self-defense of himself or others, that general proposition applies with particular weight. (See *People v. Cage* (2015) 62 Cal.4th 256, 275 ["[t]he probative value of the evidence to explain defendant's motive to commit the charged crimes" "provided a fuller explanation for the [charged criminal act]"]; *ibid*. ["[t]he 'prejudice' which section 352 seeks to avoid is that which ' " 'uniquely tends to evoke an emotional bias against [a party] . . . *and which has very little effect on the issues*' " ' "].)

The People's arguments to the contrary are not persuasive.

14

The People argue the trial court's prejudice analysis included "reasoning that if there were evidence that [E.G.] was a gang member, there was a danger the jury would speculate that [defendant] was also involved with a gang." We reject this argument, which is apparently premised on the unusual notion (antithetical to the idea of the adversarial ascertainment of truth in the courtroom (see *People v. Garcia* (1993) 17 Cal.App.4th 1169, 1181)) the trial court may prevent a party from presenting evidence out of a concern such evidence will prejudice the party.

The People also argue the trial court's decision may have been animated by concern with "undue prejudice to the [prosecution's] case arising from evidence that reflects negatively on the victim," i.e., that E.G. may have been a gang member. For support, the People cite *People v. Wright* (1985) 39 Cal.3d 576, 585. That case does not help the People. There, our Supreme Court ruled the trial court abused its discretion by excluding defendant's proffered evidence, and explained: "Although we recognize that the prosecution is accorded protection under . . . section 352, similar to that of the defense, from the use of prejudicial evidence with little probative value, the purported prejudice to the prosecution cannot be based on mere speculation and conjecture. [Citation.] Moreover, 'Evidence that is relevant to the prime theory of the defense cannot be excluded in wholesale fashion merely because the trial would be simpler without it.' " (*Ibid.*)

Here, the notion the jury would have been unduly prejudiced against the prosecution if it heard evidence defendant simply believed E.G. was a gang member is full of conjecture. On the other hand, defendant's belief was clearly relevant to the foundation of his defense.

Accordingly, the trial court's exclusion of defendant's proffered evidence was an abuse of its discretion.

15

*D.      Prejudice*

We review the question of prejudice under the "reasonable probability" standard of *People v. Watson* (1956) 46 Cal.2d 818, 836-837, asking if it is reasonably probable a more favorable result would have occurred had the erroneously excluded evidence been admitted.  (*People v. Marks* (2003) 31 Cal.4th 197, 226-227; *People v. Jandres* (2014) 226 Cal.App.4th 340, 357.)

The People argue there was no prejudice, because the excluded testimony "would have done little to corroborate . . . defendant's story."  "Even if [defendant's] testimony had been believed," the People maintain, "it failed to support the actuality, or any good-faith belief, that he was in imminent danger of death or serious bodily injury."  We disagree.

There is a reasonable probability a more favorable result would have occurred, because as we explained above, the excluded evidence would have provided important context for the issue of the genuineness of defendant's belief he needed to shoot E.G. to defend himself or others.[6]  (See *People v. Cage, supra*, 62 Cal.4th at p. 275.)  Thus, it is plausible—had defendant been able to testify he believed E.G. was a gang member when he shot him, and tell the jury why he harbored this belief—such evidence might have led at least one juror to have a reasonable doubt that defendant had the requisite mental state for attempted murder.  And "in the context of prejudice, a mistrial is a better outcome than a conviction."  (*People v. Hem* (2019) 31 Cal.App.5th 218, 230; see also *People v. Overman* (2005) 126 Cal.App.4th 1344, 1363 [reversing a conviction because it was

_____

[6] Defendant argues the trial court's ruling forced him to describe what he interpreted as gang signs by E.G. in a way that made them "seem cartoonish" (by describing "wiggling" fingers), and the prosecution "took full advantage of" the situation in closing argument by "disparag[ing] and mak[ing] light of" defendant's "claim of fear."  In light of our conclusions, we need not address this argument.

reasonably probable the jury would have convicted defendant of the lesser included offense].)

### III.  DISPOSITION

The judgment is reversed.

/S/

_____
RENNER, J.

We concur:

/S/

_____
DUARTE, Acting P. J.

/S/

_____
HOCH, J.